No. 98-492

IN THE SUPREME COURT OF THE STATE OF MONTANA

2000 MT 340

303 Mont. 164

15 P. 3d 422

VERNON KILLS ON TOP,

Petitioner and Appellant,

v.

STATE OF MONTANA,

Respondent and Respondent.

APPEAL FROM: District Court of the Sixteenth Judicial District,

In and for the County of Custer,

The Honorable John W. Larson, Judge presiding.

COUNSEL OF RECORD:

For Appellant:

James S. Thomson and Saor E. Stetler, Criminal Defense Attorneys,

Berkeley, California

Wendy Holton, Attorney at Law, Helena, Montana

For Respondent:

Hon. Joseph P. Mazurek, Attorney General; Clay R. Smith, Solicitor; Mark J. Murphy, Assistant Attorney General; Helena, Montana

Submitted on Briefs: April 27, 2000
Decided: December 19, 2000

Filed:

_____

Clerk

Justice Jim Regnier delivered the opinion of the Court.

¶1 Vernon Kills On Top (hereinafter referred to as "Petitioner") appeals from the Findings of Fact, Conclusions of Law and Order issued by the Sixteenth Judicial District Court, Custer County, dismissing his amended petition for postconviction relief, and the Findings of Fact, Conclusions of Law and Sentence designating him as a dangerous offender for parole eligibility purposes and sentencing him to the following sentences to run consecutively: 40 years imprisonment for robbery, life imprisonment without possibility of parole for aggravated kidnaping, and life imprisonment for deliberate homicide. We affirm.

¶2 With regard to the denial of Vernon Kills On Top's petition for postconviction relief, his appeal raises the following issues:

¶3 1. Whether the District Court erred when it limited its decision to Petitioner's ineffective assistance of counsel claims?

¶4 2. Whether the District Court erred when it concluded that Petitioner's right to effective assistance of counsel was not violated?

¶5 With regard to Petitioner's resentencing, his appeal raises the following issues:

¶6 3. Whether the District Court erred when it denied Petitioner's motion for a change of venue?

¶7 4. Whether the District Court erred when it admitted victim impact evidence?

¶8 5. Whether the District Court erred when it sentenced Petitioner?

## BACKGROUND

¶9 Petitioner was convicted of the aggravated kidnaping, robbery, and deliberate homicide of John Martin Etchemendy, Jr. following trial by jury in the Sixteenth Judicial District Court, Custer County, on August 6, 1988. On September 8, 1988, he was sentenced to 40 years in the Montana State Prison for robbery, and sentenced to death for the aggravated kidnaping and homicide convictions. He appealed his conviction to this Court and we affirmed. *State v. Vernon Kills On Top* (1990), 243 Mont. 56, 793 P.2d 1273, *cert. denied* (1991), 501 U.S. 1259, 111 S. Ct. 2910, 115 L. Ed. 2d 1073 ("*Vernon Kills On Top I*").

¶10 On February 19, 1992, Vernon Kills On Top filed a petition for postconviction relief in the Sixteenth Judicial District Court, Custer County. In that petition, he claimed 15 separate grounds for relief. The District Court dismissed all but part of one claim by summary judgment. The District Court denied the part of his petition which was not dismissed by summary judgment after an evidentiary hearing. In addition, the District Court denied Petitioner's combined motion to amend claims 2 and 11 of his petition and add claims 16-18, his motion for investigative assistance, his motion for leave to conduct discovery, and his motion for appointment of a psychiatrist. The District Court also denied Petitioner's motion for reconsideration.

¶11 Petitioner appealed. We reversed the District Court's dismissal of his petition for postconviction relief and remanded for an evidentiary hearing. We also vacated Petitioner's death sentence as disproportionate to his actual conduct, stating that if his conviction was affirmed on remand, the District Court must resentence him without the possibility of death. *Vernon Kills on Top v. State* (1996), 279 Mont. 384, 928 P.2d 182 ("*Vernon Kills On Top II*").

¶12 On remand, the District Court entered an order pursuant to an agreement between the parties regarding the procedures for resolving Petitioner's postconviction relief claims. On August 13, 1998, the District Court issued its Findings of Fact, Conclusions of Law and Order dismissing Petitioner's amended petition for postconviction relief. Following the dismissal of his petition for postconviction relief, the District Court scheduled a resentencing hearing. Petitioner moved to exclude victim impact testimony from the resentencing hearing and moved for a change of venue. The court orally denied both motions. The court held a resentencing hearing on November 10, 1998, at the conclusion of which the it sentenced Petitioner to 40-years' imprisonment for robbery, life imprisonment for deliberate homicide, and life imprisonment without the possibility of

parole for aggravated kidnaping, with the sentences to run consecutively. The court denied parole eligibility with respect to Petitioner's conviction for aggravated kidnaping pursuant to § 46-18-202(2), MCA (1987). The court also designated Petitioner as a dangerous offender for parole eligibility purposes.

¶13 Petitioner appeals from both the District Court's dismissal of his petition for postconviction relief and the District Court's resentencing.

## POSTCONVICTION RELIEF CLAIMS

## STANDARD OF REVIEW

¶14 We review a district court's denial of a petition for postconviction relief to determine whether the court's findings of fact are clearly erroneous and whether the court's conclusions of law are correct. *State v. L. Wilson*, 1999 MT 52, ¶ 11, 293 Mont. 429, ¶ 11, 976 P.2d 962, ¶ 11. Petitioner claims that due process requires that no deference be given to the District Court's findings of fact and conclusions of law because the District Court essentially adopted the State's proposed Findings of Fact and Conclusions of Law. We have held that a district court does not commit error when it adopts a party's proposed findings and conclusions where the adopted findings and conclusions are "sufficiently comprehensive and pertinent to the issues to provide a basis for the decision and are supported by the evidence." *Hans v. State* (1997), 283 Mont. 379, 393, 942 P.2d 674, 683. We decline to rule that the court committed reversible error by its adoption of the State's proposed findings and conclusions. However, we are mindful of the court's verbatim adoption in our analysis of whether the court's findings are clearly erroneous and whether its conclusions are correct.

## ISSUE ONE

¶15 Whether the District Court erred when it limited its decision to Petitioner's ineffective assistance of counsel claims?

¶16 On July 14, 1992, Petitioner moved the court to amend his petition for postconviction relief, adding claims 16-18. The District Court denied Petitioner's motion stating that his proposed amendments "would be futile." On appeal, we held that the District Court erred when it denied Petitioner's motion to amend. *Vernon Kills on Top II*, 279 Mont. at 393, 928 P.2d at 188. On remand, the District Court limited its decision to Petitioner's

ineffective assistance of counsel claims and did not address the merits of Petitioner's proposed claims 16-18.

¶17 Petitioner claims that the District Court erred by failing to address proposed claims 16-18 in its Findings of Fact, Conclusions of Law and Order dismissing his amended petition for postconviction relief. We agree. The scope of our remand required the District Court to determine whether Petitioner was entitled to postconviction relief on the basis of his proposed claims 16-18. We clearly stated that the District Court erred when it denied Petitioner's motion to add proposed claims 16-18. *Vernon Kills on Top II*, 279 Mont. at 393, 928 P.2d at 188. By remanding the District Court to allow Petitioner to add proposed claims 16-18, we necessarily required the District Court to address the merits of those claims.

¶18 However, we believe that the District Court's failure to address Petitioner's proposed amendments was harmless. We have held that postconviction relief proceedings are collateral attacks that are "civil" in nature and independent of the underlying criminal cause. *State v. Garner*, 1999 MT 295, ¶ 19, 297 Mont. 89, ¶ 19, 990 P.2d 175, ¶ 19 (citing *Coleman v. State* (1981), 194 Mont. 428, 433, 633 P.2d 624, 627). It is well established that "no civil case shall be reversed by reason of error which would have no significant impact upon the result; if there is no showing of substantial injustice, the error is harmless." *See Newbauer v. Hinebauch*, 1998 MT 115, ¶ 20, 288 Mont. 482, ¶ 20, 958 P.2d 705, ¶ 20. We note that the resolution of these claims depends solely on documentary evidence in the form of testimony already taken by deposition, affidavit, or at hearing. With respect to record testimony, this Court sitting in review is in as good a position as the District Court to judge the weight to be given to such testimony, as distinguished from oral testimony where the trial court actually observes the character and demeanor of the witness on the stand. *See Liberty Northwest Ins. Corp. v. Champion Intern. Corp.* (1997), 285 Mont. 76, 79, 945 P.2d 433, 435 (reviewing decision issued by Workers' Compensation Court). Furthermore, Petitioner has not requested that we remand his petition to the District Court for further proceedings on these proposed claims, but instead presents these issues to us on the merits. Accordingly, we have analyzed the merits of Petitioner's newly discovered evidence claim, *Brady* claim, and cumulative error claim to determine whether he was harmed by the District Court's failure to address these claims on remand. Upon analysis, we have determined that Petitioner's proposed claims 16-18 are without merit. Therefore, we conclude that the Petitioner was not harmed by the District Court's failure to address his proposed claims 16-18 because this error would have no impact on the District Court's denial of his petition.

## A. Newly Discovered Evidence

¶19 In proposed claim 16, Petitioner claimed that newly discovered evidence in the form of an affidavit of Diane Bull Coming warranted a new trial. Petitioner claimed that in Bull Coming's affidavit, she admitted that she may have mistakenly misconstrued Petitioner's nonverbal grunts as an assent to kill Etchemendy. On appeal, we stated that "[s]ince his alleged consent to the victim's murder served as a partial basis for the District Court's imposition of the death penalty, and since newly discovered evidence is a justification for postconviction relief, this allegation, if true, could hardly have been considered futile." *Vernon Kills on Top II*, 279 Mont. at 392, 928 P.2d at 187. The State contends that the issue in Petitioner's proposed claim 16 was only relevant to the imposition of the death penalty and, therefore, rendered moot when we vacated Petitioner's sentence. We agree.

¶20 Petitioner's proposed claim 16 is not relevant to the liability phase of his trial. In an affidavit dated May 1, 1992, Bull Coming stated, "When Vern took the blindfold off [Etchemendy], Lester got mad and said [']now he knows what we look like so we have to kill him[']. Vern grunted and I, at the time, interpreted this as agreement. . . . I agree that it is possible that my interpretation could have been wrong." In his motion to amend, Petitioner claimed that this newly discovered evidence was plainly material to the outcome of his trial because it was the only evidence offered that he had any intent to kill Etchemendy.

¶21 Whether Petitioner agreed with Lester Kills On Top that Etchemendy should be killed, however, is immaterial to Petitioner's conviction for deliberate homicide. To serve as the basis for a new trial, newly discovered evidence must, among other things, be "so material that it would probably produce a different result upon another trial." *State v. Hall*, 1999 MT 297, ¶ 54, 297 Mont. 111, ¶ 54, 991 P.2d 929, ¶ 54 (quoting *State v. Greeno* (1959), 135 Mont. 580, 342 P.2d 1052). Newly discovered evidence is "material" if it is "so highly probative of the defendant's innocence that its introduction probably would produce an acquittal." *Hall*, ¶ 55. Petitioner was convicted of deliberate homicide pursuant to § 45-5-102(1)(b), MCA (1987), the "felony murder rule." The elements of felony murder are as follows: (1) the commission of a felony; (2) death; and (3) a causal connection between the felony and the death. *State v. Kills on Top* (1990), 241 Mont. 378, 387, 787 P.2d 336, 342 ("*Lester Kills on Top I*"). Pursuant to the felony murder rule, whether Petitioner did or did not agree with Lester Kills On Top that Etchemendy should be killed is irrelevant; proof of intent to commit aggravated kidnaping or robbery is sufficient for conviction.

*Lester Kills on Top I*, 241 Mont. at 387, 787 P.2d at 341-42. Bull Coming's ambiguous interpretation of Petitioner's grunt is not at all probative of his innocence. Petitioner is not entitled to a new trial based on this evidence.

## B. *Brady* Claim

¶22 In proposed claim 17, Petitioner asserted that he was entitled to a new trial due to the prosecution's violations of its duty pursuant to *Brady v. Maryland* (1963), 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215, to disclose evidence favorable to the accused and material to the accused's guilt or punishment. Petitioner asserted that the prosecution failed to disclose evidence that Bull Coming claimed to have been repeatedly raped by a Custer County jailer and failed to disclose evidence that Bull Coming had mutilated Etchemendy. On appeal, we stated that "this *Brady* violation was cause to set aside Lester's death penalty. A similar claim could not have been futile for Vernon when Diane Bull Coming was the only witness who even linked Vernon to Etchemendy, Jr.'s death." *Vernon Kills on Top II*, 279 Mont. at 392, 928 P.2d at 187. The State contends that, as we held in *Lester Kills on Top v. State* (1995), 273 Mont. 32, 44-45, 901 P.2d 1368, 1376 ("*Lester Kills on Top II*"), any *Brady* violations it may have committed with regard to information about Bull Coming are relevant to Petitioner's sentence, but not to his conviction.

¶23 Pursuant to the Due Process Clause of the United States Constitution, the prosecution must disclose all evidence favorable to the accused that is material to either guilt or punishment. *Brady*, 373 U.S. at 87, 83 S. Ct. at 1196-97. This duty applies to proceedings in state court. *See Lester Kills on Top II*, 273 Mont. at 45, 901 P.2d at 1377. The prosecutorial duty to disclose favorable material evidence encompasses impeachment evidence. *United States v. Bagley* (1985), 473 U.S. 667, 105 S. Ct. 3375, 87 L. Ed. 2d 481. Evidence is material if there is a reasonable probability that the result would have been different had the evidence been disclosed to the defense. *Strickler v. Greene* (1999), 527 U. S. 263, 289-90, 119 S. Ct. 1936, 1952, 144 L. Ed. 2d 286; *accord Lester Kills on Top II*, 273 Mont. at 42, 901 P.2d at 1374-75. Thus, a *Brady* violation has three elements: (1) the evidence at issue must be favorable to the accused, either because it has exculpatory or impeachment value; (2) the evidence was willfully or inadvertently suppressed by the State; and (3) the suppression resulted in prejudice to the accused. *Strickler*, 527 U.S. at 281-82, 119 S. Ct. at 1948.

¶24 We previously discussed the import of this evidence with regard to Lester Kills On Top's appeal from his denial of postconviction relief. With regard to alleged information

that Bull Coming mutilated Etchemendy, we stated that it would be neither exculpatory nor useful for impeachment purposes. *Lester Kills on Top II*, 273 Mont. at 43-44, 901 P.2d at 1375-76. We decline the opportunity to reassess the value of this alleged information. With regard to Bull Coming's allegations of sexual assault, we concluded that this information had impeachment value in that Lester Kills On Top could have used it to "attempt to cast doubt on Bull Coming's veracity or to show her propensity to manipulate others." *Lester Kills on Top II*, 273 Mont. at 44, 901 P.2d at 1376. We concluded that this information should have been furnished to Lester Kills On Top because it created a reasonable probability that the outcome of his sentence would have been different had it been disclosed. However, we also held that the State's failure to disclose this information did not create a reasonable probability that the outcome of Lester Kills On Top's trial would have been different had such information been provided to the defense. *Lester Kills on Top II,* 273 Mont. at 44-45, 901 P.2d at 1376-77. We observed that although Bull Coming was an important witness for the State, there was an abundance of testimony from other accomplices and our confidence in the verdict was not undermined by the State's failure to disclose. *Lester Kills on Top II,* 273 Mont. at 45, 901 P.2d at 1376.

### 1. Bull Coming's Allegations of Rape

¶25 Bull Coming was held at the Custer County jail from October 21, 1987, until she was transferred to the Rosebud County jail on April 7, 1988. After her transfer, Bull Coming told Ron Bromley, a Rosebud County Deputy Sheriff, that she had been repeatedly sexually assaulted by a Custer County jailer. Bromley notified Bull Coming's attorney, Garry Bunke, about Bull Coming's allegations, who then called FBI agent Ed Traeger in Billings. The FBI conducted an investigation and subsequently notified the Custer County Sheriff that they would not be pursuing further action. The State never informed Petitioner's trial counsel about Bull Coming's allegations.

¶26 In order to qualify as a *Brady* violation, suppressed evidence must be both favorable to the accused and material. *Strickler*, 527 U.S. at 281-82, 119 S. Ct. at 1948. Petitioner claims that this evidence is favorable because of its impeachment value. Petitioner contends that if Bull Coming's allegation was true, this information could have been used to show that Bull Coming had a motivation to testify falsely in order "to get free of her horrific situation in jail." However, this claim is factually impossible. By the time Bull Coming testified in either Lester Kills On Top or Petitioner's trials, held in June and July of 1988, she had already been transferred out of the Custer County jail-she was transferred to the Rosebud County jail on April 7, 1988. Furthermore, Bull Coming did not face any

threat of being returned to the Custer County jail based on the truth or falsity of her testimony. This information has no impeachment value for this purpose.

¶27 Petitioner contends that if Bull Coming's allegation was false, it could have been used for three impeachment purposes: (1) it would "demonstrate Bull Coming's manipulative nature and her routine lying to get what she wants"; (2) it would contradict Bull Coming's testimony that it was Lester Kills On Top, and not she, who taunted Etchemendy as to "how he liked raping Indian girls"; and (3) it would show that Bull Coming was the "moving force behind the crimes" because she had a motive.

¶28 Bull Coming's allegation, if false, may have had some impeachment value. Whether Bull Coming falsely accused a Custer County jailer of sexually assaulting her does not establish that she had a motive to kidnap, rob, and kill Etchemendy. Similarly, Bull Coming's allegation, if proven false, does not contradict her testimony that it was Lester Kills On Top and not she who taunted Etchemendy. On the other hand, it is conceivable that had Petitioner's trial counsel been informed of this information, he could have developed facts which would somehow have indicated that Bull Coming's allegation was false, questioned Bull Coming about these facts during his cross-examination, and thus attempted to undermine her credibility. *See Lester Kills on Top II*, 273 Mont. at 44, 901 P.2d at 1376 (observing that Lester Kills on Top could have used information about Bull Coming's allegation of sexual assault to "attempt to cast doubt on Bull Coming's veracity or to show her propensity to manipulate others"). Arguably, this evidence has some favorable impeachment value.

### 2. Bull Coming's Criminal History

¶29 Petitioner also contends that the State violated *Brady* by not providing his attorney with Bull Coming's criminal history. The State argues that Bull Coming's criminal history has no impeachment value because it was inadmissible.

¶30 Bull Coming's criminal history has some impeachment value. Aspects of Bull Coming's criminal history, such as her conviction for forgery, might have been admissible as probative of her character for truthfulness or untruthfulness. *See State v. Maier*, 1999 MT 51, ¶ 55, 293 Mont. 403, ¶ 55, 977 P.2d 298, ¶ 55 (holding that circumstances surrounding a witness's previous forgery conviction were admissible pursuant to Rule 608 (b), M.R.Evid.). Although Bull Coming's criminal history may have some favorable impeachment value, it has no exculpatory value. We do not believe that Bull Coming's

criminal history could be used to disprove that Petitioner participated in the events that led to Etchemendy's kidnaping, robbery, and death.

### 3. Bull Coming's Background

¶31 Petitioner also contends that the State failed to disclose information regarding Bull Coming's allegedly violent background, false statements, long standing racial prejudice, contradictions in her testimony, failure to abide by her plea agreement conditions, and "deception and manipulation." However, with the exception of Diane Bull Coming's attack on Roy Dean Bull Coming and a note Diane Bull Coming passed to Petitioner while at the Custer County Jail, Petitioner has not directed our attention to any evidence in the record which would indicate that the State was aware of this information prior to or during his trial and intentionally or inadvertently suppressed it. Moreover, this evidence has no favorable exculpatory value with regard to Petitioner's guilt or innocence. For instance, information concerning Bull Coming's background does not tend to disprove that Petitioner drove the car in which Etchemendy was held and robbed. Petitioner has also not explained how any of this evidence might have been used at the time of his trial to impeach Bull Coming.

### 4. Conclusion

¶32 In sum, Petitioner did not establish that the State failed to disclose any exculpatory evidence. However, Petitioner did establish that the State failed to disclose some information which may have been useful in impeaching Bull Coming's testimony-namely, Bull Coming's sexual assault allegation and Bull Coming's previous criminal history. Petitioner contends that the "evidence at trial was weak and circumstantial as it related to [his] involvement in the crimes" and that "the most damning evidence was the testimony offered by Bull Coming." Petitioner also states that this information could have "shredded [Bull Coming's] credibility in front of the jury."

¶33 Petitioner's assertion that the State's failure to disclose Bull Coming's criminal history or sexual assault allegation was prejudicial is completely without merit. In no way could the failure to disclose this information "reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Kyles v. Whitley* (1995), 514 U. S. 419, 435, 115 S. Ct. 1555, 1566, 131 L. Ed. 2d 490. No amount of suppressed evidence merely impeaching Bull Coming's testimony could establish a reasonable probability that the result of Petitioner's trial would have been different. Had Bull Coming's testimony

been completely discredited or excluded entirely, an overwhelming abundance of accomplice testimony and corroborative evidence established that Petitioner participated in or aided and abetted Etchemendy's aggravated kidnaping, Petitioner participated in or was accountable for Etchemendy's robbery, and Etchemendy died as a result of this criminal episode thereby exposing Petitioner to liability for felony murder. *See Vernon Kills on Top II*, 279 Mont. at 401-06, 928 P.2d at 193-96 (reviewing evidence supporting Petitioner's conviction while, at the same time, not accepting Bull Coming's testimony at "face value"); *see also Vernon Kills on Top I*, 243 Mont. at 86-89, 793 P.2d at 1294-96 (discussing the plethora of evidence corroborating the testimony of Petitioner's accomplices); *cf. Lester Kills on Top II,* 273 Mont. at 44-45, 901 P.2d at 1376 (reviewing accomplice testimony, other than testimony of Bull Coming, which supported Lester Kills On Top's conviction).

¶34 Petitioner is not entitled to a new trial based on alleged *Brady* violations. The State did not violate *Brady* with regard to the guilt phase of Petitioner's trial because any favorable information the State failed to disclose was not material to Petitioner's guilt or innocence.

## C. Cumulative Error

¶35 In proposed claim 18, Petitioner claimed that he suffered a cumulative denial of due process due to all of the circumstances alleged in his previous claims. On appeal, we stated that "[c]umulative error can serve as a basis for reversal." *Vernon Kills on Top II*, 279 Mont. at 392, 928 P.2d at 187. We do not, however, apply the cumulative error doctrine when no errors have been shown. *State v. Beavers*, 1999 MT 260, ¶ 60, 296 Mont. 340, ¶ 60, 987 P.2d 371, ¶ 60.

ISSUE TWO

¶36 Whether the District Court erred when it concluded that Petitioner's right to effective assistance of counsel was not violated?

¶37 Criminal defendants are guaranteed the right to the assistance of counsel pursuant to the Sixth Amendment of the United States Constitution and Article II, Section 24 of the Montana Constitution. *State v. Jones* (1996), 278 Mont. 121, 124, 923 P.2d 561, 562. The right to counsel protects the fundamental right to a fair trial guaranteed by the Due Process Clauses of the United States Constitution. *Strickland v. Washington* (1984), 466 U.S. 668,

684-85, 104 S. Ct. 2052, 2063, 80 L. Ed. 2d 674. The right to the assistance of counsel is of critical importance to a criminal defendant's right to a fair trial because access to counsel's skill and knowledge is necessary to accord a defendant the opportunity to test the prosecution's case in our adversarial system. *Strickland*, 466 U.S. at 685, 104 S. Ct. at 2063. For that reason, the Supreme Court has recognized that the right to assistance of counsel is the right to effective assistance of counsel. *Strickland*, 466 U.S. at 686, 104 S. Ct. at 2063.

¶38 A convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction has two components:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

*Strickland, 466 U.S. at 687, 104 S. Ct. at 2064. Generally, a defendant must establish both parts of the test to prevail. Jones, 278 Mont. at 133, 923 P.2d at 567. However, when a defendant establishes that counsel's performance was deficient in that counsel suffered from an actual conflict of interest which adversely affected the defendant's representation, prejudice to the defense is presumed. See N. Wilson v. State, 1999 MT 271, ¶ 17, 296 Mont. 465, ¶ 17, 989 P.2d 813, ¶ 17. Petitioner claims that his counsel, for purposes of his trial and direct appeal, committed prejudicial errors and that his counsel suffered from actual conflicts which adversely affected his representation.*

A. Ineffective Assistance Due to Prejudicial Errors

¶39 Petitioner contends that John S. Forsythe, his attorney for purposes of his trial and direct appeal, committed two prejudicial errors which denied him the right to effective assistance of counsel. Petitioner maintains that he was prejudiced by Forsythe's failure to use available impeachment evidence from Lester Kills On Top's trial which would have demonstrated that Bull Coming controlled the other participants in the crimes. Petitioner also insists that he was prejudiced by Forsythe's failure to fully challenge Bull Coming's testimony. In order to succeed, Petitioner must establish that Forsythe made errors so serious that he was "not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment," and he must establish that he was prejudiced by Forsythe's allegedly deficient performance. *See Strickland*, 466 U.S. at 687, 104 S. Ct. at 2064.

### 1. Impeachment Evidence

¶40 Petitioner claims that Forsythe failed to use the trial transcript from Lester Kills On Top's trial to challenge witnesses in his trial. Petitioner refers us to the following impeachment evidence which he claims Forsythe erroneously failed to introduce and which caused him prejudice: (1) Bull Coming's testimony in Lester Kills On Top's trial that Lester beat her up at the Golden West Bar was impeached by the testimony of Steve Hathaway who testified that he saw Bull Coming hitting Lester Kills On Top; (2) Bull Coming testified in Lester Kills On Top's trial that Lester shoved her out of the door at the Golden West Bar while Jenelle Eads testified that she saw blood on Lester's face; (3) at Petitioner's trial Bull Coming denied speaking to Etchemendy before he got into the vehicle driven by Petitioner, while Bull Coming told the FBI she had talked to Etchemendy in the Golden West Bar parking lot; and (4) Lavonne Quiroz testified at Lester Kills On Top's trial that Bull Coming was mad at Doretta Four Bear for running away while in Ashland, Montana. Petitioner insists that this "impeachment evidence demonstrates that Bull Coming controlled the other defendants including [himself]."

¶41 We agree with the District Court that Petitioner has failed to establish that, by reason of these alleged omissions, Forsythe's performance was so deficient as to fall outside the "wide range of reasonable professional assistance." *See Strickland*, 466 U.S. at 689, 104 S. Ct. at 2065. As the State observes, the testimony to which Petitioner has directed our attention has no evidentiary significance with regard to his guilt or innocence. Whether Bull Coming hit Lester Kills On Top in the Golden West Bar; whether she shoved Lester Kills On Top out the door of the Golden West Bar; whether she first talked to Etchemendy in the parking lot or in the vehicle; or whether she was angry at Doretta Four Bear for running away does not tend to disprove that Petitioner participated in or was accountable for the aggravated kidnaping and robbery of Etchemendy which resulted in his death. Moreover, this evidence does not tend to establish that Bull Coming "controlled the other defendants, including [him]." Petitioner has not proven that by failing to introduce this evidence, Forsythe's performance was so deficient that he was "not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Strickland*, 466 U.S. at 687, 104 S.Ct. at 2064.

### 2. Failure to Challenge Bull Coming's Testimony

¶42 Petitioner contends that Forsythe committed prejudicial error by failing to fully challenge Bull Coming's testimony. Petitioner insists that Forsythe failed to investigate

Bull Coming's background, the circumstances of her plea bargain, her prior acts of violence, her criminal background, her history of manipulation, and her history of prostitution. The District Court concluded that Forsythe's investigation into Bull Coming's background was of reasonable breadth and was adequate to allow Forsythe to pursue his strategy of minimizing Petitioner's involvement in this criminal episode. The court also noted that Petitioner did not establish prejudice in this regard because, at most, such information would have merely tended to portray Bull Coming as a greater actor in the criminal episode than she testified to at Petitioner's trial-a fact that would have made no difference in view of Petitioner's liability for Etchemendy's kidnaping, robbery, and death regardless of the precise nature of each accomplice's contribution to the criminal episode. We agree.

¶43 This ineffective assistance claim is essentially the same as Petitioner's *Brady* claims. The test for prejudice under *Strickland* is the same as the test for materiality under *Brady*. *Strickland*, 466 U.S. at 694, 104 S. Ct. at 2068. As we stated above in our discussion of Petitioner's *Brady* claims, had Bull Coming's testimony been completely discredited or excluded entirely, an overwhelming abundance of accomplice testimony and corroborative evidence established that Petitioner participated in the series of events which led to Etchemendy's kidnaping, robbery, and death. Petitioner was not prejudiced by any alleged error Forsythe may have committed in his investigation of Bull Coming's background.

### B. Ineffective Assistance Due to Conflicts of Interest

¶44 Petitioner contends that his attorney, Forsythe, for purposes of his trial and direct appeal, was burdened with two conflicts of interest which denied him the right to effective assistance of counsel. One alleged conflict relates to Forsythe's campaign for district judge for the Sixteenth Judicial District and his campaign for county attorney of Rosebud County. The other alleged conflict relates to a book Forsythe authored entitled Death Sentence: Murder On the Prairie. The District Court held that Petitioner failed to establish either an actual conflict or any connection between any alleged actual conflict and an adverse effect.

¶45 In *Cuyler v. Sullivan* (1980), 446 U.S. 335, 348, 100 S. Ct. 1708, 1718, 64 L. Ed. 2d 333, the Supreme Court held that a defendant who did not raise an objection at trial to a conflict of interest arising from multiple representation must demonstrate that an actual conflict of interest adversely affected his lawyer's performance.[1] We have held that in order to succeed on a conflict of interest claim, a defendant must prove: (1) counsel

actively represented conflicting interests; and (2) the conflict adversely affected counsel's performance. *State v. Wereman* (1995), 273 Mont. 245, 249, 902 P.2d 1009, 1011. If a defendant establishes both elements, we will presume that the defendant was prejudiced by the conflict. *Wereman*, 273 Mont. at 249, 902 P.2d at 1011.

### 1. Campaigns for Public Office

¶46 On March 16, 1988, Forsythe filed a Statement of Candidate, announcing his candidacy for district judge of the Sixteenth Judicial District. Forsythe's campaign advertisements noted that he was the Rosebud County attorney for 12 years with "80% convictions in over 3,000 cases" and that he had authored the book, Death Sentence. Forsythe lost his bid for a district judge position in a primary election held on June 7, 1988. Petitioner's trial began on July 26, 1988. Forsythe filed a Statement of Candidate, announcing his candidacy for county attorney of Rosebud County on March 9, 1990. Petitioner's direct appeal was deemed submitted to this Court on March 13, 1990, and decided on May 21, 1990. Petitioner's petition for rehearing was denied on June 15, 1990. Forsythe won the election for county attorney of Rosebud County in November 1990.

¶47 We agree with the District Court that Petitioner failed to establish an actual conflict based on Forsythe's campaigns for public office. We have previously stated that in order to establish a violation of the right to assistance of counsel based on a conflict of interest, the defendant must establish the existence of an actual conflict, not just a possibility of a conflict, through a factual showing on the record. *N. Wilson*, ¶ 18. Other courts have addressed claims of conflict based on similar facts and have concluded that such claims fail to establish the existence of an actual conflict. For instance, in *Garcia v. Bunnell* (9th Cir. 1994), 33 F.3d 1193, the Ninth Circuit held that defense counsel's plan to work for the district attorney's office at the end of petitioner's trial did not create an actual conflict of interest. The court concluded that the petitioner failed to establish that his counsel "actively represented competing interests." *Garcia*, 33 F. 3d at 1198. In so holding, the court stated, "[W]e generally presume that the lawyer is fully conscious of the overarching duty of complete loyalty to his or her client." *Garcia*, 33 F.3d at 1198-99 (quoting *Burger v. Kemp* (1987), 483 U.S. 776, 784, 107 S. Ct. 3114, 3120, 97 L. Ed. 2d 638). Similarly, in *United States v. Horton* (7th Cir. 1988), 845 F.2d 1414, defense counsel in federal court was a finalist for appointment as the United States Attorney for that district at the same time as he counseled his client to accept a plea agreement. The Seventh Circuit held: "We will not indulge in the presumption that a defense attorney who is being considered for a position as United States Attorney is unable to represent a defendant in federal court to the

best of his ability and with the defendant's best interests in mind." *Horton*, 845 F.2d at 1419.

¶48 The fact that Forsythe was a candidate for district court judge and county attorney during his representation of Petitioner does not establish an actual conflict without further support in the record. We agree with the analysis of *Horton* and will not presume that a defense attorney who is campaigning for a position as a district judge or a county attorney is unable to represent a defendant to the best of his or her abilities and with the defendant's best interests in mind.[(2)] Furthermore, the record does not disclose that Forsythe actively represented competing interests. It is not entirely inconceivable that an unprincipled candidate for county attorney or district judge might attempt to curry political favor with the electorate by ensuring that an unpopular client does not escape conviction and then publicizing his or her role in obtaining that conviction. However, Petitioner has not presented us with any evidence that this occurred. A hypothetical conflict is insufficient; in order to succeed, a defendant must establish the existence of an actual conflict, not just the possibility of a conflict, through a factual showing on the record. *N. Wilson*, ¶ 18. As the District Court observed, there is absolutely no evidence that Forsythe's representation of Petitioner was an issue in either election. Forsythe's advertising of his success rate as the county attorney of Rosebud County during his campaigns did not raise the issue of his representation of Petitioner.

¶49 Although we conclude that Petitioner's claim of a conflict of interest based on Forsythe's campaigns for public office fails because he did not establish the existence of an actual conflict, we also note that Petitioner failed to establish any effect which resulted from this alleged conflict, let alone an adverse effect. Once an actual conflict is shown, the defendant need demonstrate only that some effect on counsel's handling of a particular aspect of the trial was likely. *N. Wilson,* ¶ 18. As the State observes, Forsythe's campaign activity during the period of his representation of Petitioner was insubstantial. Forsythe lost his bid for a position as a district judge prior to Petitioner's trial. The only actions undertaken by Forsythe with respect to his representation of Petitioner after filing for the county attorney of Rosebud County position were an oral argument on Petitioner's direct appeal and a petition for rehearing.

2. <u>Death Sentence</u>

¶50 Forsythe published a book in 1983 entitled <u>Death Sentence: Murder on the Prairie</u>. In <u>Death Sentence</u>, Forsythe describes the prosecution of Dewey Coleman and Robert Nank

for the kidnaping, rape, and murder of Peggy Harstad.[3] The crimes occurred in Rosebud County, and Forsythe became involved in their prosecution upon assuming the position of Rosebud County Attorney in January 1975. Petitioner directs our attention to the conclusion of <u>Death Sentence</u>, in which Forsythe wrote:

> Criminal prosecution at its best creates a naked struggle between good and evil. The good forces use their weapons of scientific investigation, exposure of the truth at public trials and in the media, and the threat and use of punishment against the wicked. The evil forces counter with distortion and lies, secrecy, delay and every device that diminishes the good weapons. Can we doubt that God is involved in these titanic clashes?

> . . . .

> It is frustrating to see the evil force apparently succeed, as murderers and other criminals go undetected or are freed on technicalities, and big lies masquerade popularly as the truth. It is most unfortunate in capital cases to have the federal court system duplicate the already redundant, multiple reviews of the state court. Since we have so little faith in our courts, and since our courts have so little faith in themselves, it is not surprising that our courts are so ineffective.

> What a shame that Peggy Harstad's murderers could formulate and carry out her death in a few hours, but our court system waits ten years or more to respond with equal justice. But with our dedicated efforts, I do believe Dewey Coleman will hang.

John Forsythe, <u>Death Sentence: Murder on the Prairie</u> 89 (1983).

¶51 We agree with the District Court that Petitioner failed to establish that Forsythe suffered from an actual conflict of interest based on his statements in the conclusion of <u>Death Sentence</u>. Petitioner contends that Forsythe's hostile attitude toward the representation of criminal defendants, legal "technicalities," and federal habeas corpus review, as evidenced by the conclusion to <u>Death Sentence</u> quoted above, conflicted with his representation of Petitioner. However, Forsythe's conclusion to <u>Death Sentence</u> is simply not evidence that Forsythe "actively represented conflicting interests." *See Wereman*, 273 Mont. at 249, 902 P.2d at 1011. Once again, Petitioner has established the possibility of a conflict, but has completely failed to establish the existence of an actual conflict "through a factual showing on the record." *See N. Wilson,* ¶ 18. In fact, a review

of the record leads us to exactly the opposite conclusion. Forsythe's representation of Petitioner manifests that he was neither biased against criminal defendants as a class nor hostile to the use of "legal technicalities" in their defense. As the District Court noted:

> Forsythe raised "technical" defenses on Petitioner's behalf. He argued that the amended information failed to give Petitioner adequate notice of the offenses with which he was charged; that the District court lacked jurisdiction over some or all of the offenses; that Petitioner was denied a speedy trial; that the District Court improperly denied a motion to suppress physical evidence seized at the time of Petitioner's arrest in Billings; and that the District Court improperly denied a motion to suppress statements made by Petitioner to Federal Bureau of Investigation special agents following the arrest. *Vernon Kills on Top I*, 243 Mont. at 70-80, 82-85, 793 P.2d at 1282-89, 1290-92. The suggestion that the last page of <u>Death Sentence</u> in some fashion reflects an unwillingness on Forsythe's part to advance defenses that might be regarded by the lay public as technical cannot be reconciled with his actions in this matter.

¶52 In sum, we conclude that the District Court did not err in denying Petitioner's request for a new trial. Petitioner is not entitled to a new trial on the basis of newly discovered evidence because that evidence was immaterial to his guilt or innocence. The State did not violate its *Brady* obligation because the information it failed to disclose was immaterial to Petitioner's guilt or innocence. Lastly, Petitioner was not deprived of his right to effective assistance of counsel. Forsythe did not suffer from an actual conflict of interest nor was Forsythe's performance so deficient as to fall outside the wide range of reasonable professional assistance. Petitioner's criminal liability for these charges has been tested by a district court trial, on direct appeal to this Court, on an application for certiorari to the United States Supreme Court, in a petition for postconviction relief in District Court, on appeal from the denial of his petition to this Court, on remand to the District Court, and in the instant appeal. Petitioner's convictions stand; he is not entitled to a new trial.

RESENTENCING CLAIMS

ISSUE THREE

¶53 Whether the District Court erred when it denied Petitioner's motion for a change of venue?

¶54 Petitioner contends that the District Court erred when it denied his motion for a change of venue for the resentencing hearing because, "[a]lthough there was no jury to be influenced by the emotionally charged atmosphere surrounding this case, there was a serious danger that the District Court was improperly influenced by the prevailing climate."

¶55 With regard to a motion for a change of venue, we have stated that an accused is entitled to a change of venue when it appears there are reasonable grounds to believe that the prejudice alleged actually exists and that by reason of the prejudice there is a reasonable apprehension that the accused cannot receive a fair and impartial trial. *State v. Abe*, 1998 MT 206, ¶ 34, 290 Mont. 393, ¶ 34, 965 P.2d 882, ¶ 34. We review a district court's decision to deny a motion for a change of venue to determine whether the court abused its discretion. *Abe*, ¶ 34.

¶56 Petitioner has not directed us to any evidence in the record that the prejudice he alleged actually existed at the resentencing hearing. He claims that "the resentencing hearing was revisited with the same air of hostility that the original trial and sentencing proceedings carried." In support of this contention, Petitioner observes that the victim's family and supporters were present during the proceedings as was the local media. The presence of the victim's family and supporters and the local media are not reasonable grounds for believing that prejudice in the form of an "air of hostility" actually existed. Nor do we believe that the presence of the victim's family and the media affected the District Court to the extent that there was a reasonable apprehension that Judge Larson could not provide Petitioner with a fair and impartial resentencing hearing. The District Court did not abuse its discretion in denying Petitioner's motion for a change of venue.

## ISSUE FOUR

¶57 Whether the District Court erred when it admitted victim impact evidence?

¶58 Over Petitioner's objections, the District Court admitted three exhibits offered by the State during Petitioner's resentencing. The State's Exhibit A consisted of a transcript of Etchemendy's father's testimony given during Lester Kills On Top's resentencing hearing. The State's Exhibit B was a videotape showing Etchemendy playing with his children. The State's Exhibit C was a letter included in Petitioner's presentence investigation report, in which Colleen Newton, Etchemendy's widow, expressed her thoughts about how the murder of her husband had affected her and her children's lives.

¶59 Petitioner contends that the admission of victim impact evidence at sentencing is prohibited by *Booth v. Maryland* (1987), 482 U.S. 496, 107 S. Ct. 2529, 96 L. Ed. 2d 440. Whether the admission of this evidence violates *Booth* is a question of law which we will review for correctness. *See State v. Clemo*, 1999 MT 323, ¶ 5, 297 Mont. 316, ¶ 5, 992 P.2d 1263, ¶ 5.

¶60 Petitioner's claim that the admission of victim impact evidence violated *Booth* fails for a number of reasons. In *Booth*, the Supreme Court held that the Eighth Amendment of the United States Constitution prohibits a jury from considering victim impact evidence at the sentencing phase of a capital trial. *Booth* is, by its very terms, only applicable to jury sentencing in a death penalty case. *Booth*, 482 U.S. at 503, 107 S. Ct. at 2533 (holding that victim impact evidence is inadmissible in a capital case because it creates a constitutionally unacceptable risk that "the jury may impose the death penalty in an arbitrary and capricious manner"). *See also State v. Langford* (1991), 248 Mont. 420, 437, 813 P.2d 936, 949; *Vernon Kills on Top I*, 243 Mont. at 103-04, 793 P.2d at 1305; *Lester Kills on Top I*, 241 Mont. at 400, 787 P.2d at 350; *State v. Dawson* (1988), 233 Mont. 345, 360, 761 P.2d 352, 361; *State v. Keith* (1988), 231 Mont. 214, 237, 754 P.2d 474, 488. Furthermore, we note that *Booth* has been expressly overruled by *Payne v. Tennessee* (1991), 501 U.S. 808, 830, 111 S. Ct. 2597, 2611, 115 L. Ed. 2d 720.

¶61 Petitioner also contends that admission of Colleen Newton's letter and the videotape of the victim playing with his children rendered the resentencing hearing fundamentally unfair because he was not able to confront these witnesses. Whether Petitioner's right to confront witnesses was violated is a question of law which we will review for correctness. *See Clemo*, ¶ 5.

¶62 This claim also fails. We have previously upheld the admission of nontestimonial victim impact evidence. *See Langford*, 248 Mont. at 437, 813 P.2d at 949 (letters); *Dawson*, 233 Mont. at 359-60, 761 P.2d at 361 (victim impact statement in presentence investigative report); *Keith*, 231 Mont. at 236, 754 P.2d at 488 (victim impact statement in presentence investigation report). Furthermore, we have held that an offender's right to confront witnesses and an offender's due process rights at sentencing are satisfied so long as the offender is informed of the information that will be presented and is provided an opportunity to rebut that information. *State v. DeSalvo* (1995), 273 Mont. 343, 350, 903 P.2d 202, 206. *See also Williams v. New York* (1949), 337 U.S. 241, 69 S. Ct. 1079, 93 L. Ed. 2d 1337 (holding that a sentencing judge's consideration of out of court evidence did not violate defendant's right to due process). Petitioner was informed of the information

that the State planned to present at his resentencing hearing and was provided with ample opportunity to respond to that information. The District Court did not err in admitting victim impact evidence during Petitioner's resentencing.

## ISSUE FIVE

¶63 Whether the District Court erred when it sentenced Petitioner?

¶64 The District Court resentenced Petitioner to 40 years for robbery, life imprisonment for aggravated kidnaping, and life imprisonment for deliberate homicide, with the sentences to run consecutively. The court denied Petitioner eligibility for parole with respect to his conviction for aggravated kidnaping because "his conduct in connection with such crime was an integral part of the events leading to the victim's death and because [Petitioner] had the opportunity to take action to terminate the kidnaping and thereby prevent the victim's brutal and needless death." The District Court also designated Petitioner a dangerous offender for parole eligibility purposes, stating that he "represents a substantial danger to other persons or society by reason of his participation in this brutal criminal episode." The court noted that Petitioner is a recovering alcoholic and has been alcohol-free since his incarceration and that several certified chemical dependency counselors testified that they believe he is likely to remain sober. The court noted, however, that these counselors also testified that there can be no guarantee of continued sobriety. The court stated that "[i]n the absence of any assurance in this regard and in view of the nature of the conduct for which [Petitioner] has been convicted, he represents a substantial danger to other persons or society."

¶65 We review a criminal sentence for legality only (i.e.,whether the sentence is within the statutory parameters). *State v. Montoya*, 1999 MT 180, ¶ 15, 295 Mont. 288, ¶ 15, 983 P.2d 937, ¶ 15. Petitioner claims that the application of this standard of review to him violates federal and state constitutional prohibitions against *ex post facto* laws because the standard of review at the time he committed the offenses was whether the court abused its discretion. *See, e.g., State v. Graveley* (1996), 275 Mont. 519, 521, 915 P.2d 184, 186. We disagree. A rule of decision is only prohibited as *ex post facto* if it punishes as a crime an act which was not unlawful when committed, if it makes the punishment for a crime more burdensome, or if it deprives the person charged with a crime of any defense available under the law at the time the act was committed. *State v. Leistiko* (1992), 256 Mont. 32, 36, 844 P.2d 97, 99-100 (citing *Beazell v. Ohio* (1925), 269 U.S. 167, 46 S. Ct. 68, 70 L. Ed. 216). Application of our clarified standard of review in *Montoya* does not punish

Petitioner for a crime which was not unlawful when committed, does not make his punishment more burdensome, and does not deprive him of a defense to the crime charged.

## A. Presentence Investigation Report

¶66 At the end of his resentencing hearing, Petitioner objected to the evaluation and recommendation contained in his presentence investigation report in that it was "not based upon the factual information provided to the probation officer," "it's biased in favor of the State," "it's based on hearsay and uninvestigated reports," and that his criminal history data was not verified. The District Court stated that "[a]s an objection, I overrule it. I will consider it as argument." The court accepted the report. On appeal, Petitioner contends that he was prejudiced by a biased and partial probation officer who wrote his presentence investigation report.

¶67 A convicted defendant has a due process guarantee against a sentence predicated on misinformation. *State v. Bauer*, 1999 MT 185, ¶ 21, 295 Mont. 306, ¶ 21, 983 P.2d 955, ¶ 21. Under the constitutional guarantee of due process, an offender must be given an opportunity to explain, argue, and rebut any information, including presentencing information, that may lead to a deprivation of life, liberty, or property. *See Bauer*, ¶ 22. However, due process does not protect against all misinformation--rather, the inquiry turns on whether the sentence was premised on materially false information. *Bauer*, ¶ 22. An offender is under an affirmative duty to show that the alleged misinformation is materially inaccurate or prejudicial before a sentence will be overturned by this Court. *Bauer*, ¶ 22. Furthermore, we have recognized that "where a sentencing court is found not to have relied on improper or erroneous information in sentencing a criminal defendant, there is 'nothing to correct or rebut' and, therefore, that the defendant is not entitled to resentencing on due process grounds." *Bauer,* ¶ 24 (quoting *Coleman v. Risley* (1983), 203 Mont. 237, 250-51, 663 P.2d 1154, 1162). Accordingly, in order to succeed on his claim, Petitioner must establish that the District Court relied upon materially inaccurate or prejudicial information in sentencing him.

¶68 Petitioner is not entitled to resentencing on due process grounds. Petitioner was provided with his presentence investigation report prior to the sentencing hearing and the court provided him the opportunity to explain, argue, and rebut the information contained therein. Petitioner's counsel extensively cross-examined the author of the report, Probation and Parole Officer Margaret Corbett, and his counsel offered evidence and testimony in support of Petitioner's position. Petitioner has not established that the court relied on any

misinformation in sentencing him, let alone any material misinformation. Therefore, Petitioner is not entitled to resentencing on due process grounds--there is nothing in the District Court's sentence to correct or rebut.[(4)]

## B. Parole Eligibility

¶69 Petitioner insists that the District Court erred when it denied him eligibility for parole with respect to his conviction for aggravated kidnaping. The court denied Petitioner eligibility for parole because "his conduct in connection which such crime was an integral part of the events leading to [Etchemendy's] death and because [Petitioner] had the opportunity to take action to terminate the kidnaping and thereby prevent [Etchemendy's] brutal and needless death."

¶70 We conclude that the District Court did not err when it denied Petitioner eligibility for parole with respect to his conviction for aggravated kidnaping. Pursuant to § 46-18-202 (2), MCA (1987), a district court may deny a defendant eligibility for parole whenever it imposes a sentence of imprisonment in the state prison for a term exceeding one year. If the district court chooses to deny eligibility, the court shall state its reasons in writing. The District Court abided by the statutory requirements. The court imposed a sentence for a term of more than one year and stated its reasons for denying Petitioner parole eligibility. Furthermore, the factual basis for the court's reason is not clearly erroneous. Petitioner's conduct in connection with the kidnaping was an integral part of the events leading up to the Etchemendy's death and he did have the opportunity to take action to terminate the kidnaping and prevent Etchemendy's death. As the District Court noted in its findings of fact, Petitioner drove the car in which Etchemendy was held from Miles City, Montana, to Ashland, Montana; he heard Etchemendy pounding on the trunk of the car in Gillette, Wyoming, and instructed Lavonne Quiroz to move the vehicle to an alley where any noise made by Etchemendy would be less likely to be heard; and he took no action to stop Lester Kills On Top and Bull Coming after they left the bar in Gillette with the disclosed purpose of murdering Etchemendy.

## C. Dangerous Offender

¶71 Petitioner contends that the District Court erred when it designated him a dangerous offender for purposes of parole eligibility because its designation was unsupported. The District Court designated Petitioner a dangerous offender for parole eligibility purposes, stating that he "represents a substantial danger to other persons or society by reason of his

participation in this brutal criminal episode and for the reasons stated in paragraph 11 of the Findings of Fact." In paragraph 11, the court found that Petitioner is a recovering alcoholic and has been alcohol-free since his incarceration and that several certified chemical dependency counselors testified that they believe he is likely to remain sober. The court noted, however, that these counselors also testified that there can be no guarantee of continued sobriety. The court stated that "[i]n the absence of any assurance in this regard and in view of the nature of the conduct for which [Petitioner] has been convicted, he represents a substantial danger to other persons or society."

¶72 We conclude that the District Court's dangerous offender designation was adequately supported. We review a district court's dangerous offender designation to determine whether the court abused its discretion. *State v. Eichenlaub* (1995), 272 Mont. 332, 338, 901 P.2d, 90, 94. The court determined that Petitioner represented a substantial danger to other persons or society, thus making him ineligible for nondangerous offender status pursuant to § 46-18-404(1)(b), MCA (1987). The court cited to specific facts taken from the record when giving its reasons why Petitioner represented a substantial danger. *See State v. Collier* (1996), 277 Mont. 46, 58, 919 P.2d 376, 384 (stating that "a district court must give specific facts taken from the record of the case as reasons for making its decision"). The facts taken from the record in support of the court's designation are not clearly erroneous. Petitioner does not contest the fact that he participated in a brutal criminal episode, that he is an alcoholic, that alcohol played a role in the offenses, and that there is no guarantee of his continued sobriety.

D. Maximum Sentences to be Served Consecutively

¶73 Petitioner contends that the District Court "violated the principles of inter and intra case proportionality" when it sentenced him to the maximum allowable sentence for each conviction and ordered the sentences to run consecutively. The District Court sentenced Petitioner to 40 years for robbery, life imprisonment for aggravated kidnaping, and life imprisonment for deliberate homicide, with the sentences to run consecutively.

¶74 As stated above, we review sentences for legality only. *Montoya*, ¶ 15. The District Court did not exceed its statutory authority in sentencing Petitioner. Petitioner's sentences all fall within the applicable statutory parameters. *See* § 45-5-401(2), MCA (1987) (robbery punishable by up to a 40-year term of imprisonment); § 45-5-303(2), MCA (1987) (aggravated kidnaping punishable by death, life imprisonment, or up to 100 years imprisonment); § 45-5-102(2), MCA (1987) (deliberate murder punishable by death, life

imprisonment, or up to 100 years imprisonment). Accordingly, we hold that the court lawfully sentenced Petitioner. To the extent Petitioner's complaints relate to the equity of his sentence, those complaints are properly addressed to the Sentence Review Division of this Court. *See State v. Gordon*, 1999 MT 169, ¶ 54, 295 Mont. 183, ¶ 54, 983 P.2d 377, ¶ 54.

¶75 Affirmed.

/S/ JIM REGNIER

We Concur:

/S/ J. A. TURNAGE

/S/ JAMES C. NELSON

/S/ W. WILLIAM LEAPHART

Justice Terry N. Trieweiler concurring and dissenting.

¶76 I concur with the majority's resolutions of Issues 1 through 4.

¶77 I dissent from the majority's conclusion that there was substantial evidence to support the District Court's determination that Vernon Kills On Top should be ineligible for parole.

¶78 First of all, it should be noted that eligibility for parole does not guarantee parole. Section 46-23-201(1), MCA (1987), conditions parole on the parole board's determination that, "there is reasonable probability that the prisoner can be released without detriment to the prisoner or to the community. . . ." Furthermore, subparagraph (2) of the same statute provides that: "[a] prisoner shall be placed on parole only when the board believes that he is able and willing to fulfill the obligations of a law-abiding citizen."

¶79 The issue then is whether there is something about a defendant's background which presents such a threat to society that the parole board should be precluded from ever considering whether that person can "fulfill the obligations of a law-abiding citizen." In this case, the District Court concluded that no matter how long Vernon Kills On Top is incarcerated, and no matter how great the degree of his rehabilitation, the parole board

should never be allowed to even consider his suitability for reentry to society because of the nature of his crime and the fact that no one can guarantee that he will never drink again.

¶80 Section 46-18-202(2), MCA (1987) provides that the District Court may restrict a Defendant's eligibility for parole "[i]f the Court finds that the restriction is necessary for the protection of society . . . ."

¶81 Section 46-18-404, MCA (1987) provides that Vernon Kills On Top was eligible to be designated a nondangerous offender if he did "not represent a substantial danger to other persons or society." The District Court designated the Defendant in this case ineligible for parole based on its conclusion that his conduct was an integral part of the events leading to the victim's death and because he did not prevent the victim's death. The District Court designated the Defendant a dangerous offender because of his participation in the events leading to the victim's death and because there was no testimony that the Defendant's sobriety could be guaranteed in the future.

¶82 The District Court found as a fact that Defendant participated in the battering and robbery of the victim and used the victim's credit card to purchase gas. However, those findings are not supported by the record of the Defendant's trial. After thorough review of that record, this Court pointed out that the State's only witness:

> [S]tated that at no time while Etchemendy was in the trunk of the group's vehicle did Vernon ever strike him, injure him, or take anything of monetary value from him. She agreed that he never initiated talk of murder other than in response to Lester and then said "later."

*Kills On Top v. State (1996), 279 Mont. 384, 406, 928 P.2d 182, 196.*

> The only reliable evidence is that Diane Bull Coming confiscated Etchemendy's credit card and that Diane and Lester cashed Etchemendy's checks and divided the money. While a portion of the money was given to Vernon, he misplaced it, and even that portion was subsequently retrieved by Diane. Neither is the dissent correct when it repeats the allegation from this Court's previous opinion that Vernon did nothing in the pre-murder stages to prevent the homicide. According to even Diane's testimony, Vernon repeatedly stalled suggestions that Etchemendy be murdered.

*Kills On Top, 279 Mont. at 408, 928 P.2d at 197.*

¶83 The District Court, as did the dissent in *Kills On Top v. State*, clung to discredited facts reported in this Court's original opinion found at *State v. Vernon Kills On Top* (1990), 243 Mont. 56, 793 P.2d 1273.

¶84 Upon thorough review of the actual record this Court concluded in *Kills On Top II* that:

> Based on even Diane's testimony, Vernon Kills On Top was not present when Etchemendy was killed, and he did not participate in any act which caused Etchemendy's death. While she did testify that on two separate occasions he agreed that something would have to be done with the victim, she also testified that he sought to postpone any further harm to the victim and that after his expression of reluctance, she and Lester took the victim to another location where Lester performed the murderous act himself.

*Kills On Top, 279 Mont. at 405, 928 P.2d at 195.*

> However, while Etchemendy was in the trunk, it was Vernon who let him out to go to the bathroom; Vernon who checked on his condition; and Vernon who incurred his brother's wrath by removing Etchemendy's blindfold so that he could go to the bathroom

*Kills On Top, 279 Mont. at 408, 928 P.2d 197.*

¶85 Therefore, when the District Court concludes that no matter how long the Defendant has been imprisoned, and no matter the degree of his rehabilitation, he will still be "a substantial danger to other persons" and his lifetime imprisonment is necessary for the "protection of society" and then bases those conclusions on findings that the Defendant battered and robbed his victim, used his credit card to purchase gas, and did nothing to avoid his death, the District Court's conclusions were based on findings that are clearly erroneous.

¶86 Furthermore, the District Court's conclusion that Defendant can never be eligible for release because no one can guarantee that he will never drink again is completely arbitrary, ignores the best evidence available regarding an alcoholic's rehabilitation and condemns every criminal defendant who has ever had an associated drinking problem to a denial of parole.

¶87 No court could ever be presented with stronger evidence of an alcoholic's rehabilitation than was presented to the District Court in this case. Four different chemical dependency or substance abuse counselors testified at the Defendant's sentencing hearing. None expressed the remotest concern that Vernon Kills On Top would resume drinking if released from prison.

¶88 Miles Finly, a certified chemical dependency counselor at Montana State Prison described the Defendant as a positive role model for other inmates who would make a model citizen if released from prison.

¶89 Ginger Faver, who is also a certified chemical dependency counselor at Montana State Prison, described the Defendant as "an inspiration" to other inmates and stated that she "would be very comfortable having Vern be a neighbor." She said that she trusted him and would have no qualms about his release from prison.

¶90 William Martin is a chemical dependency counselor at Montana State Prison. He described his selection of the Defendant as an assistant to help in the rehabilitation of others and explained that he has received treatment to help avoid relapsing to alcohol abuse that was unavailable outside the prison. He testified that his rehabilitation was "[a]s good as or as better as anybody else I have ever seen." He described the Defendant as "head and shoulder above any inmate I know." He stated that if released from prison the Defendant would be a "model citizen. I have no fear of him. He would be a wonderful man to be in our society. I believe that this man would save lives for what he has already gone through, and what he can do I think is just amazing."

¶91 Ken Ingle is the Substance Abuse Program Supervisor at Montana State Prison, who has conducted close to 2000 alcohol assessments in parol and probation cases and 3500 alcohol assessments overall. He testified that, "of the men that I met since I have been at Montana State Prison, Vern Kills On Top is what I hope that we, as taxpayers, can bring about through our correctional system."

¶92 None of the alcohol or drug counselors to whom the Defendant has been exposed during the over ten years of his imprisonment gave the slightest suggestion that he would return to alcohol consumption if he was released from prison.

¶93 In addition to the counselors referred to in the preceding paragraphs, the bakery manager, with whom Defendant has worked during his incarceration, and his housing unit

manager were called as witnesses. Other prison employees were interviewed as part of the presentence investigation. All were unanimous in their praise of the Defendant as a model inmate with no infractions in over ten years who performed a constructive role at the prison and who by all appearances has been rehabilitated from a life set in motion by his own childhood of abuse, neglect, and poverty, and his adulthood dependence on alcohol.

¶94 In sum, more could not have been shown to demonstrate that at least at some point in his life, Vernon Kills On Top should be allowed to appear before the parole board and give them the opportunity to consider whether after many years of imprisonment, rehabilitation, and positive contributions to the prison administration and the rehabilitation of other inmates he could be released "without detriment to the prisoner or to the community" and "that he is able and willing to fulfill the obligations of a law abiding citizen."

¶95 The District Court ignored the evidence presented at the Defendant's sentencing hearing and resurrected discredited findings regarding the Defendant's participation in the events which led to his imprisonment in order to support its conclusion that he should be ineligibile for parole. Therefore, I conclude that that conclusion was based on findings which are not supported by substantial evidence and are clearly erroneous. For the reasons set forth in this opinion, I dissent from the majority's conclusion to the contrary. I would reverse the District Court's determination that at no time during the remainder of his life, regardless of how he lives the remainder of his life, should Vernon Kills On Top be eligible to rejoin society.

/S/ TERRY N. TRIEWEILER

1. The Supreme Court has not decided whether the *Cuyler* standards apply to conflict of interest claims outside of the multiple client representation context. Federal appellate courts are divided. *Compare Beets v. Scott* (5th Cir. 1995), 65 F.3d 1258, 1265, *cert. denied* 517 U.S. 1157, 116 S. Ct. 2516, 135 L. Ed. 2d 204 (limiting *Cuyler* to cases of multiple representation), *with United States v. Moree* (2d Cir. 2000), 220 F.3d 65, 69 (applying *Cuyler* standards to defendant's claim that conflict arose between himself and his counsel after defendant criticized his counsel's performance), *and United States v. Del Muro* (9th Cir. 1996), 87 F.3d 1078, 1080 (applying *Cuyler* to conflict of interest claim not involving multiple representation). We have applied *Cuyler* to defendants' claims of ineffective assistance of counsel due to conflicts of interest which do not involve multiple representation. *See, e.g., State v. Wereman* (1995), 273 Mont. 245, 902 P.2d 1009.

2. As the District Court noted, this presumption would eliminate a sizable portion of the defense Bar from seeking public office.

3. For a description of the Coleman prosecution, see *State v. Coleman* (1991), 249 Mont. 128, 814 P.2d 48.

4. We also note that Petitioner has not shown that Officer Corbett did not comply with the requirements of § 46-18-112, MCA. Section 46-18-112, MCA, provides that "whenever an investigation is required, the probation officer shall promptly inquire into and report upon: (a) the defendant's characteristics, circumstances, needs, and potentialities; (b) the defendant's criminal record and social history; (c) the circumstances of the offense; (d) the time of the defendant's detention for the offenses charged; (e) the harm caused, as a result of the offense, to the victim, the victim's immediate family, and the community; and (f) the victim's pecuniary loss, if any."