No. 90-271

IN THE SUPREME COURT OF THE STATE OF MONTANA

1991

DARYLE R. MURPHY, as Guardian Ad
Litem for L. C.,

      Plaintiff and Appellant,

v.

STATE OF MONTANA, and THE DEPARTMENT
OF INSTITUTIONS FOR THE STATE OF MONTANA,

      Defendants and Respondents.

FILED

APR 11 1991

*Ed Smith*
CLERK OF SUPREME COURT
STATE OF MONTANA

APPEAL FROM:   District Court of the First Judicial District,
In and for the County of Lewis and Clark,
The Honorable Thomas C. Honzel, Judge presiding.

COUNSEL OF RECORD:

      For Appellant:

            Donald W. Molloy, Esq., Billings, Montana
            Gary E. Wilcox, Esq., Billings, Montana
            Terry L. Seiffert, Esq., Billings, Montana

      For Respondent:

            Mark D. Parker, Esq., Billings, Montana
            Kimberly A. Kradolfer, Esq., Assistant Attorney
            General, Helena, Montana

Submitted:  March 7, 1991

Decided:  April 11, 1991

Filed:

Clerk

Chief Justice J. A. Turnage delivered the Opinion of the Court.

The plaintiff, L.C., brought this action in the District Court of the First Judicial District, Lewis and Clark County, to recover damages from the State of Montana as a consequence of her confinement and treatment in the Montana State Hospital at Warm Springs. Here, she appeals an order granting partial summary judgment to the State for all acts or omissions before July 1, 1973. We affirm.

The issues are:

1. Did the District Court err in ruling that the State's purchase of insurance for a later time period did not waive sovereign immunity for torts occurring prior to 1973?

2. Did the court err in ruling that the statutory bond requirements for state employees do not waive sovereign immunity?

3. Did the court err in holding that the daily operation of Montana State Hospital at Warm Springs was not a proprietary function which would preempt the defense of sovereign immunity?

The State moves to strike references in L.C.'s recitation of the facts to a deposition of Dr. Harr. That deposition is not in the record on appeal. This Court frowns upon references in briefs to matters not in the record. Such matters will not be considered by the Court. Garza v. Peppard (1986), 222 Mont. 244, 248, 722 P.2d 610, 612-13. The statements attributed to Dr. Harr have not been considered in reaching this Opinion.

L.C. was placed in the state mental institution, Montana State Hospital at Warm Springs, in 1963 at the age of thirteen. Except for brief periods, she remained there until 1975. In 1986, through her guardian ad litem, she filed this suit, alleging that she became seriously mentally ill as a result of being confined in the Montana State Hospital. Her complaint includes claims of false imprisonment; cruel and inhumane punishment; denial of freedom, due process, education and equal protection; outrageous conduct; negligence; and negligent supervision.

In March 1987, the District Court granted the State's motion to dismiss this action, ruling that the statute of limitations had run before the complaint was filed. Concluding that L.C.'s double disability of minority and mental illness had tolled the statute of limitations, this Court reversed the lower court's ruling and remanded the case for further proceedings. Murphy for L.C. v. State (1987), 229 Mont. 342, 748 P.2d 907.

On remand, the State moved for partial summary judgment that sovereign immunity bars recovery for any of its acts before July 1, 1973. After briefing and oral argument, the court entered an order granting that motion. L.C. obtained certification of the order under Rule 54(b), M.R.Civ.P., and appeals.

3

I

Did the District Court err in ruling that the State's purchase of insurance for a later time period did not waive sovereign immunity for torts occurring prior to 1973?

L.C. argues that an insurance policy purchased to cover the State for personal injury and other claims for the period from July 1, 1973, through July 1, 1976, relates back to her claims because some of her damages were manifested during that period. The District Court noted that under § 1-2-109, MCA, no law is retroactive unless expressly so declared and that prior to July 1, 1973, the State could not be sued for injury caused by its actions or those of its officers. Under the 1889 Montana Constitution, the State had sovereign immunity. The court found no indication in legislative history of an attempt to extend a waiver of sovereign immunity to pre-1973 torts committed by the State. Further, it reviewed federal case law and concluded that because L.C.'s injury manifested itself prior to the insurance policy period, the insurance policy does not cover the injury.

After the District Court made its ruling, this Court issued its opinion in Crowell v. School Dist. No. 7 (Mont. 1991), 805 P.2d 522, 48 St.Rep. 81. In Crowell, the Court held that the purchase of insurance may waive sovereign immunity to the extent of the insurance coverage. Therefore, we must examine the terms of the insurance policy.

4

L.C. maintains that her claims fall under coverage "E," personal injury liability, of the State's insurance policy. She argues that the policy contains no time limitation on when an injury under coverage "E" occurred.

Coverage "E" applies to damages for false arrest, detention, imprisonment, malicious prosecution, libel or slander, publication or utterance in violation of an individual's right of privacy, and wrongful entry or eviction or other invasion of the right of private occupancy. It provides that "damages" means "only those damages which are payable because of personal injury arising out of an offense to which this insurance applies." The insurance policy provides at endorsement #1 that

> (b) . . . the total liability of the company for all damages because of all . . . personal injury and other damages to which this policy applies <u>which occur during each annual period while this policy is in force commencing from its effective date</u> shall not exceed the limit of liability stated in the Schedule of this endorsement . . . [Emphasis supplied.]

Endorsement #1 clearly encompasses personal injury under coverage "E" and limits damages to those which occur "during each annual period while this policy is in force commencing from its effective date."

L.C. also argues that, under the insurance policy's definition of "occurrence," her claim constitutes one "occurrence" lasting from her initial hospitalization in 1963 to her eventual release

5

in 1975. The policy language upon which she relies appears in endorsement #1:

> (c) For the purpose of determining the limit of the company's liability, all . . . personal injury, and other damages to which this policy applies arising out of continuous or repeated exposure to substantially the same general conditions shall be considered as arising out of one occurrence.

The policy defines "occurrence" as:

> an event, or a continuous or repeated exposure to conditions, which results in bodily injury or property damage during the policy period that is neither knowingly nor intentionally caused by or at the direction of the insured.

L.C. argues that all of her damages arise from one "occurrence" which is covered under the policy.

In interpreting the term "occurrence" in insurance policies, courts have developed several theories of exception to the basic principle that an insurance policy provides coverage only for incidents occurring during the policy period. These theories were developed in cases involving delayed manifestation of injury, as in exposure to asbestos. Coverage has been allowed if the act causing the injury occurred during the policy period or if the injury initially manifested itself during the policy period. See Hancock Laboratories, Inc. v. Admiral Ins. (9th Cir. 1985), 777 F.2d 520.

In this case, neither the State's acts or omissions prior to July 1, 1973, nor the initial manifestation of the injury occurred

6

during the policy period. Because L.C. alleges that she became seriously mentally ill by February of 1964, she admits that her injury manifested itself prior to the policy period.

L.C. cites Truck Ins. Exchange v. Woldstad (1984), 212 Mont. 418, 687 P.2d 1022, as authority that damages need not occur while the insurance policy is in force. In that case, Woldstad died from injuries received after the expiration of the insurance policy provided by Truck Insurance Exchange. This Court held that, nevertheless, there was coverage under the policy. But that insurance policy contained language not found in the State's policy here. Specifically, coverage was provided for "bodily injury, sickness or disease, including death at anytime resulting there-from, sustained by any person." Woldstad, 687 P.2d at 1024.

We conclude that claims arising from pre-1973 acts or omissions by the State are not covered under the terms of this insurance policy. We hold that the District Court was correct in ruling that the State did not waive sovereign immunity for the period prior to 1973 by its purchase of the insurance policy for the period from July 1, 1973, through July 1, 1976.

II

Did the court err in ruling that the statutory bond requirements for state employees do not waive sovereign immunity?

Sections 6-101 to 6-104, RCM (1947), repealed in 1965 and replaced by §§ 6-105 to 6-108, RCM (1947), mandated that surety

7

bonds be purchased for state officers and employees. L.C. argues that under Longpre v. Joint School District No. 2 (1968), 151 Mont. 345, 443 P.2d 1, these mandatory bonding requirements waive the defense of sovereign immunity.

In Longpre, this Court held that a statute requiring school districts operating their own buses to carry automobile bodily injury and liability insurance constituted a waiver of the school districts' immunity from suit, to the extent of the insurance coverage. In this case, the District Court concluded that application of the rule set forth in Longpre would only protect from the mishandling of state funds and does not constitute a complete waiver of sovereign immunity. The court stated that there is nothing in the bonding statutes which implies a legislative intent to waive immunity for torts committed by a bonded state officer or employee. We agree. The statutes are aimed at protection from mishandling of state funds. "The amount for which a state officer or employee shall be bonded shall be based on the amount of money or property handled and the opportunity for defalcation." Section 6-106, RCM (1947).

L.C. also argues that the State's immunity was waived under the Civil Rights Act of 1964, codified at 42 U.S.C. §§ 2000d to 2000d-4. The terms of the Act became applicable to the Montana State Hospital at Warm Springs in 1965 when the hospital became part of the Division of Mental Hygiene of the Department of

8

Institutions. Although L.C. raised this argument before the District Court, that court did not address the argument.

The federal courts have recognized that remedies available under the Act do not include monetary damages. Drayden v. Needville Independent School Dist. (5th Cir. 1981), 642 F.2d 129, 133; but see Rhodes v. Charter Hosp. (S.D. Miss. 1989), 730 F.Supp. 1383, as to recovery of back pay. Moreover, the Act is addressed to discrimination on grounds of race, color, or national origin, none of which have been claimed here. We conclude that this argument has no merit.

Because the bond purchased by the State is not included in the record, the issue of whether the terms of that bond waived immunity in this instance is not before us. We hold that the District Court did not err in concluding that the bonding statutes do not waive immunity for the tort and constitutional claims raised here.

III

Did the court err in holding that the daily operation of Montana State Hospital at Warm Springs was not a proprietary function which would preempt the defense of sovereign immunity?

L.C. asserts that the daily operation of a state mental hospital is a proprietary function under which the defense of sovereign immunity is not allowed. She cites Jacoby v. Chouteau County (1941), 112 Mont. 70, 112 P.2d 1068.

Jacoby involved an accident on a county-operated ferry which crossed the Missouri River. The case stands for the general proposition that governmental units are liable for negligence in the exercise of proprietary functions. Here, the District Court concluded that because the establishment of the state institution for the insane was constitutionally mandated in Article X, Section 1 of the 1889 Montana Constitution, and was not discretionary, its operation was a governmental and not a proprietary function.

That operation of a hospital by a unit of government is required and not merely permitted indicates that the activity is a governmental rather than a proprietary function. See, Annotation, "Immunity from liability for damages in tort of state or governmental unit or agency in operating hospital," 25 ALR 2d 203, 223 (1952). Another consideration is whether the hospital is operated for profit, an indication of a proprietary function, or as a charity, an indication of a governmental function. Annotation, 25 ALR 2d at 219. The Montana State Hospital at Warm Springs is not run as a profit-making venture.

We hold that the District Court did not err in ruling that the constitutionally mandated state mental hospital was a governmental function under the shield of sovereign immunity prior to 1973.

Affirmed.

_____
Chief Justice

We concur:

John Conway Harrison

Karla M. Gray

P. C. McDonough

_____
Justices

11

Justice William E. Hunt, Sr., dissenting:

I dissent. The facts alleged by plaintiff, if true, paint an ugly and disturbing picture of events that occurred at the Montana State Hospital at Warm Springs. At the age of 13, L.C. was diagnosed as having "behavior problems" and was confined by the State to the hospital. While in the "care" of the hospital she was denied the opportunity to associate with children of her own age and instead lived with adults suffering from severe mental illnesses. She was prohibited from obtaining an education and was compelled to work at the hospital to earn spending money. She received numerous electric shock treatments as punishment for her behavior. She was raped by male employees. When she protested the assaults, the hospital ignored her complaints. She was forced to engage in "cock fights" with other patients while staff members observed and wagered on the results.

Despite this outrageous treatment, the majority allows the State to hide behind the shield of sovereign immunity by adhering to the troubling and somewhat strained distinctions between governmental and proprietary functions. Even allowing that the regular day-to-day operation of the hospital is a governmental function, the activities alleged in this case are so horrifying that one cannot seriously believe that they flowed from the pursuit of governmental objectives. Surely, no government that I wish to be a part of would engage in such appalling conduct.

Although the State may be immune from suit for torts arising from the discharge of governmental functions, there are times when the misdeeds alleged by the plaintiff exceed the bounds of governmental purposes. "[T]he intentional use or misuse of a badge of governmental authority for a purpose unauthorized by law is not the exercise of a governmental function." Smith v. Department of Public Health, 410 N.W.2d 749, 780 (Mich. 1987). Here, we have a case where the hospital at Warm Springs, under the guise of governmental authority, engaged in illegal acts for the purpose of punishing and warehousing L.C., not for treating and caring for her. The hospital refused to give L.C. educational opportunities granted by the Montana Constitution. It forced her to work for wages in contravention of Montana law. It stood by silently while she was raped by employees. It condoned her degradation for the financial gratification of staff members. Certainly, none of these activities were authorized by law. Certainly, the hospital should not be allowed to engage in such cruel and inhumane conduct without fear of reprisal.

The judiciary is the sanctuary of the dispossessed, of those who have a voice in no other quarter. It should not tolerate the State's exploitation of the individual by hiding behind slight legal niceties such as the ones used here. If the plaintiff's allegations are true, the shield of sovereign immunity has become the sword of institutional brutality.

13

If the plaintiff's allegations are not true, the shield of sovereign immunity has denied our public servants the opportunity to repudiate the accusations.

I would reverse the District Court.

_____
Justice

Justice Terry N. Trieweiler dissenting:

I concur in the dissent of Justice Hunt.

_____
Justice

14