
DA 09-0284

IN THE SUPREME COURT OF THE STATE OF MONTANA

2010 MT 229

STATE OF MONTANA,

        Plaintiff and Appellee,

    v.

ANTHONY ROY ST. DENNIS,

        Defendant and Appellant.

APPEAL FROM:    District Court of the Fourth Judicial District,
In and For the County of Missoula, Cause No. DC 2007-503
Honorable John W. Larson, Presiding Judge

COUNSEL OF RECORD:

        For Appellant:

            Colin M. Stephens, Smith & Stephens, P.C., Missoula, Montana

        For Appellee:

            Steve Bullock, Montana Attorney General, Sheri K. Sprigg, Assistant
Attorney General, Helena, Montana

            Fred Van Valkenburg, Missoula County Attorney, Missoula, Montana

        For Amicus Curiae American Civil Liberties Union of Montana Foundation:

            Elizabeth L. Griffing, ACLU of Montana Foundation, Missoula, Montana

Submitted on Briefs: July 28, 2010

Decided: October 28, 2010

Filed:

_____
Clerk

Justice Patricia O. Cotter delivered the Opinion of the Court.

¶1     Anthony Roy St. Dennis appeals from his 2009 conviction of felony deliberate homicide in the Fourth Judicial District Court in Missoula County.  We affirm.

## ISSUES

¶2     We restate the issues St. Dennis presents:

¶3     Did the District Court err when it ruled that the Montana Office of Public Defender (OPD) did not violate St. Dennis' constitutional rights by representing both St. Dennis and his co-defendant, Dustin Strahan (Strahan)?

¶4     Did the District Court abuse its discretion when it denied St. Dennis' requests for immunity for a proposed witness?

¶5     Did the District Court abuse its discretion in denying St. Dennis' motion for a new trial?

## FACTUAL AND PROCEDURAL BACKGROUND

¶6     On December 6, 2007, officers from the Missoula County Police Department responded to a call reporting an unresponsive male lying in the footpath near the California Street walking bridge in Missoula.  Upon arrival, the officers surmised that the man, later identified as Forrest Clayton Salcido, a local homeless man, had suffered a severe beating and appeared to be dead.  Emergency medical personnel, who arrived shortly after the police, confirmed that Salcido was dead.

¶7     Later that day Strahan's mother called the police and reported that her son had information about the incident.  Strahan and his mother were interviewed by officers on the afternoon of December 6.  The officers informed Strahan of his *Miranda* rights prior

to the interview. During the interview, Strahan told the officers that he and St. Dennis had been drinking heavily on the previous evening and wandered down to the California Street Bridge. Strahan reported that they saw a homeless man on the footpath and St. Dennis approached the man and instigated a fight. At the time, St. Dennis was 18 years old, was 6 foot 2 inches tall and weighed 200 pounds. Salcido was 56 years old, 5 foot 4 inches tall and weighed 113 pounds. Despite the disparity in size, Salcido fought back and Strahan admitted that he assisted St. Dennis by throwing a few punches at Salcido. As the fight escalated, Salcido was knocked to the ground. Strahan told officers that St. Dennis then "stomped" the man's head at least ten times. Unable to pull St. Dennis off Salcido, Strahan turned to leave. St. Dennis followed, leaving Salcido lying on the ground.

¶8 After Strahan's interview, the officers went to St. Dennis' grandmother's house where St. Dennis lived. The grandmother allowed the officers to enter and search her home. They found St. Dennis hiding in a bedroom closet. St. Dennis cooperated and provided the officers with the clothing he had worn the night before and his shoes, which appeared to have blood stains on them. The officers took these items and St. Dennis to the police station. After receiving a *Miranda* warning, St. Dennis refused to speak to the officers without an attorney present. The officers arrested St. Dennis and transported him to the Missoula County Detention Center. While at the Detention Center, St. Dennis called a friend using the Detention Center telephone. Inmates using the Detention Center phone are clearly notified that phone calls are recorded. Despite knowing that his

conversation was being recorded, St. Dennis repeatedly admitted to his friend that he had killed the man near the California Street Bridge.

¶9 On December 18, 2007, the Missoula County Attorney filed an Information charging St. Dennis with deliberate homicide in violation of § 45-5-102(1), MCA, or in the alternative, accountability for deliberate homicide, under §§ 45-2-301 and 45-5-102(1), MCA. Strahan was similarly charged. On December 20, St. Dennis, represented by Public Defender Ferguson, entered a plea of "not guilty." Shortly thereafter a witness, initially referred to as Witness X (later identified as Micah Baldwin), came forward claiming to have information about Salcido's death. He offered to talk to St. Dennis' attorneys, provided he was granted immunity. St. Dennis did not seek immunity for Witness X at that time.

¶10 At a February 28, 2008 scheduling conference, the District Court noted that both St. Dennis and co-defendant Strahan were being represented by the OPD. The court inquired whether this created a conflict of interest within the OPD. Public Defender (PD) Ferguson advised the court that she would consult with her superiors.

¶11 On March 27, 2008, State Regional Public Defender Sheehy and State Chief Public Defender Hood attended a scheduled status conference. Sheehy and Hood explained to the District Court the procedure for appointing counsel for co-defendants and assured the court that the OPD operating process did not create conflicts. The court ordered the OPD to file a legal memorandum on the issue. Regional PD Sheehy filed the memorandum on April 10, 2008. Subsequently, the court issued an order concluding

4

that, given the conflict protections in place at OPD, it could continue to represent both St. Dennis and Strahan.

¶12    On July 11, 2008, St. Dennis moved for an order granting immunity to Witness X, claiming that he had "some very interesting information to add to the alleged events of December 5/6, 2007" pertaining to St. Dennis and Strahan's charges. The State argued that St. Dennis was not entitled to a judicial order compelling the government to grant immunity to Witness X. It urged the District Court to require St. Dennis to identify the witness and establish that the witness' testimony would add relevant information about the incident before granting immunity. In St. Dennis' reply to the State's brief, St. Dennis argued that § 46-15-331, MCA, Montana's statute governing immunity, was controlling. He opined that he had satisfied the requirements of the statute and the court should grant his request. On August 14, relying on *State v. Haskins*, 255 Mont. 202, 211, 841 P.2d 542, 547 (1992), the District Court ruled that St. Dennis had "not offered any proof regarding the testimony it will elicit from the proposed witness, and this [c]ourt can not [sic] determine if, at a minimum, the testimony is relevant without further information."

¶13    The parties were allowed to submit a response to the court's order on immunity. St. Dennis, urging the District Court to reconsider its order, asserted that the court's failure to grant immunity to Witness X would violate St. Dennis' "right to present a meaningful defense." On September 10, the court denied St. Dennis' request for reconsideration. The court noted that while St. Dennis had offered to identify the witness in camera and provide the court with the complete recorded statement of Witness X, St.

Dennis had not proposed how this review could be accomplished without creating an improper ex parte communication. Ultimately, St. Dennis removed Witness X from his trial witness list and did not call him as a witness.

¶14 St. Dennis' trial began on January 5, 2009, in Hill County. On January 8 around 4:00 p.m., after both St. Dennis and the State had rested their cases-in-chief but before closing arguments on January 9, detectives with the Missoula Police Department interviewed three people, two of whom, S.E.W. and P.W., claimed to have information pertaining to the events surrounding Salcido's death. Baldwin was the third interviewee. He was picked up after the other two implicated him in Salcido's beating. St. Dennis' attorneys were not told of the interviews nor were the interview statements made available to defense counsel at that time. On January 9, the jury returned a verdict finding St. Dennis guilty of deliberate homicide. Counsel for St. Dennis received copies of the interview transcripts on January 13.

¶15 On February 5, 2009, St. Dennis moved for a new trial on the grounds that the State failed to disclose the evidence contained in these statements and that such failure was a violation of *Brady v. Maryland*, 373 U.S. 83 (1963). The State opposed the motion asserting that by the time the State took these witness statements, both the prosecution and the defense had rested their cases, and therefore it was not obligated to disclose the interviews to St. Dennis. Additionally, the State averred, St. Dennis failed to establish a *Brady* violation because the evidence was not suppressed by the prosecution, it was not favorable to St. Dennis, and the statements were immaterial.

6

¶16 On March 5, the District Court denied St. Dennis' motion for a new trial, concluding that S.E.W. and P.W.'s witness statements were hearsay. Moreover, as it pertained to Baldwin's statement, the court held that St. Dennis could have identified Baldwin and called him as a witness. As such, St. Dennis could not now claim prejudice based on lack of access to Baldwin's interview statement. The District Court determined that the undisclosed statements did not negate the evidence presented at trial establishing St. Dennis' involvement in the crime. Therefore, St. Dennis did not satisfy the *Brady* test, in that he did not adequately demonstrate that " 'there is a reasonable probability' that the result of the trial would have been different if the statements at issue had been disclosed to the defense prior to closing arguments."

¶17 On March 17, 2009, the District Court entered judgment against St. Dennis. He was sentenced to 100 years and is not eligible for parole for 40 years. St. Dennis filed a timely Notice of Appeal on May 18, 2009.

## STANDARDS OF REVIEW

¶18 This Court reviews a district court's denial of a request for immunity and a ruling on a motion for a new trial for an abuse of discretion. *Haskins*, 255 Mont. at 211, 841 P.2d at 547.

¶19 St. Dennis and the State disagree on the standard of review this Court should utilize in reviewing whether representation of co-defendants by the OPD creates a conflict of interest and violates a defendant's constitutional rights. St. Dennis urges a de novo review based on the constitutional importance of a right to conflict-free counsel. He asserts that this issue resembles a claim for ineffective assistance of counsel which we

7

review de novo. *State v. Green*, 2009 MT 114, ¶ 14, 350 Mont. 141, 205 P.3d 789. The State, relying on *State v. Glick*, 2009 MT 44, ¶ 11, 349 Mont. 277, 203 P.3d 796, opines we should review this issue for an abuse of discretion. As have other courts in similar circumstances, we will review the conflict of interest issue de novo. *See State of Illinois v. Morales*, 808 N.E. 2d 510, 512-13 (Ill. 2004).

## DISCUSSION

¶20 *Did the District Court err when it ruled that the OPD did not violate St. Dennis' constitutional rights by representing both St. Dennis and his co-defendant, Dustin Strahan?*

¶21 The Office of the State Public Defender, created in 2006, is the first statewide public defender system in the country. It is divided into 11 regions and according to OPD, is conceptually designed so that each regional office is an "independent law firm." In this case, St. Dennis was appointed two defense attorneys out of OPD's Region 2 Missoula office. Strahan, St. Dennis' co-defendant, was appointed two Region 1 OPD attorneys, one out of the agency's Kalispell office and one from the Polson office.

¶22 In response to the District Court's inquiry of St. Dennis' counsel whether the OPD's representation of both defendants created a conflict of interest, the State Chief Public Defender Randi Hood and State Regional Public Defender Ed Sheehy attended a March 27, 2008 status conference. The court noted at this conference that the Rules of Professional Conduct apply to criminal and civil cases, and had lawyers from a single law firm wished to represent Strahan and St. Dennis, they would have been precluded from doing so because such action could create a conflict of interest. The court asked why such a rule did not apply to lawyers from the OPD. Sheehy offered that his office has

8

handled several other cases in which a potential conflict between co-defendants has arisen through representation by OPD lawyers. He explained that there are written protocols on how these potential conflicts are handled. One such protocol, he stated, precludes attorneys in the same regional office from representing co-defendants. In cases with co-defendants, OPD attorneys in separate regions are automatically assigned.

¶23 In providing other examples of privacy and confidentiality protections, Sheehy described to the court the method of keeping client bills separate to ensure confidentiality. He also noted that lawyers from different regions do not have physical access to OPD offices in other regions, unless granted controlled access for temporary work assignments, nor do they have computer access to other OPD lawyers' files. He further asserted that individual attorneys do not have access to any attorney/client privilege information held by other individual attorneys. He stated that OPD has a conflict manager who oversees potential conflicts between regions and attorneys. Under certain circumstances, clients are asked to sign a waiver. If the client does not wish to sign the waiver, an attorney from outside the OPD office is appointed. In the case before us, St. Dennis and Strahan were not offered waivers because Sheehy knew immediately of the conflict and handled it by assigning Strahan's case to attorneys from another regional office. After Sheehy's presentation, the State suggested that OPD file a legal memorandum to which the State could respond. The District Court so ordered and on April 10, 2008, the OPD filed a legal memorandum.

¶24 In his memorandum, Sheehy addressed an analogous New York Court of Appeals case. In *People v. Wilkins*, 268 N.E.2d 756 (N.Y. 1971), the New York Court of Appeals

refused to treat the New York City Legal Aid Society (NYLAS) as it would a law firm. At that time, NYLAS consisted of four branches and three units and had approximately 150 lawyers. The New York Court explained that while "knowledge of one member of a law firm will be imputed by inference to all members of that law firm, we do not believe the same rationale should apply to a large public-defense organization such as the Legal Aid Society. . . . [T]here is no evidence that information concerning defendants being represented by the society flows freely within the office . . . ." Sheehy explained the standards and safeguards the Montana Public Defender Commission had adopted, which guaranteed that each regional office was a separate "firm" under the Montana Rules of Professional Responsibility (MRPR), for conflicts of interest purposes. Sheehy urged the District Court to conclude, as did the New York Court, that there is no "per se conflict of interest" within the OPD, and that the appointed attorneys from different regional offices should be allowed to continue representing the co-defendants in this case.

¶25 The State filed a response to Sheehy's legal memorandum, asserting there was no significant risk that St. Dennis and Strahan's representation by the OPD would result "in any inappropriate exchange of confidential client information or any other such detrimental conduct to either defendant." Thus, the State had no objection to the continued representation of St. Dennis by the OPD. The District Court issued its order on July 2, 2008, instructing OPD to continue representing St. Dennis. The court stated that it did "not find sufficient evidence of a conflict of interest." It therefore required nothing more from the parties' attorneys on this issue.

¶26 On appeal, St. Dennis claims that the conflict of interest in his case violated his Sixth and Fourteenth Amendment rights under the United States Constitution and his Article II, Section 24 rights under the Montana Constitution. Specifically, he asserts that because both Strahan's and his attorneys were assigned, managed and supervised by Sheehy, OPD is a single firm and, as such, there existed an actual conflict of interest between the attorneys representing Strahan and St. Dennis. He maintains that this actual conflict adversely affected his representation, as reflected in the disparity of sentences. Strahan, who gave information implicating St. Dennis in Salcido's death and testified against St. Dennis at trial, received 30 years at Montana State Prison (MSP) with 25 suspended, while St. Dennis received 100 years at MSP with a parole restriction of 40 years. St. Dennis urges the Court to adopt the rule that joint representation of co-defendants by public defenders, as in this case, is a per se conflict of interest requiring reversal.

¶27 The State urges us to consider "the unique nature of public defenders' offices," and argues we should review cases raising the conflict issue within the OPD offices on a case-by-case basis. The State points out that significant hardships would arise if the Court adopted a "per se rule" that automatically compels disqualification of one public defender because another public defender has already been appointed to represent a co-defendant.

¶28 It is well-established that criminal defendants are guaranteed the right to the assistance of counsel pursuant to the Sixth Amendment of the United States Constitution and Article II, Section 24 of the Montana Constitution. *Kills On Top v. State*, 2000 MT

11

340, ¶ 37, 303 Mont. 164, 15 P.3d 422. This right has been interpreted to guarantee the "right to conflict-free representation" deriving from the Sixth Amendment as applied to the states by the Due Process Clause of the Fourteenth Amendment. *State v. Cook*, 144 Idaho 784, 791, 171 P.3d 1282, 1289 (2007). We must therefore determine whether allegations of a conflict of interest within OPD should be reviewed under a per se rule, as urged by St. Dennis, or on a case-by-case basis as urged by the State.

¶29 The critical distinction between the per se and the case-by-case approach lies in the obligation imposed on the defendant who seeks reversal based upon a purported conflict. *Glick*, ¶ 19, (*citing Cuyler v. Sullivan*, 446 U.S. 335, 348-49, 100 S. Ct. 1708, 1718 (1980)). Under the per se rule, if it is determined a conflict actually exists, automatic reversal is the remedy without any need to show adverse effect. Under the case-by-case approach, if defendant proves that an actual conflict exists, he or she must then demonstrate that counsel's performance was adversely affected by the conflict. *Morales*, 808 N.E. 2d at 514-15. If counsel's performance was adversely affected, defendant need not demonstrate prejudice; we will presume prejudice. *Kills On Top*, ¶ 45.

¶30 In deciding upon the approach to be taken in OPD conflict of interest cases, we consider among other factors the unique nature of public defender offices as opposed to private law firms. Unlike private law firms, the OPD is a not-for-profit public entity with a single source of clients engaged in a single type of legal proceeding. The OPD does not solicit clients or accept referrals from the public. Moreover, the attorneys are salaried employees rather than participants in the profits and revenue generated by a law firm.

12

*People v. Christian*, 41 Cal. App. 4th 986, 995 (1996). As such, their compensation is not driven by their success or failure.

¶31 Given its sparse population, the state of Wyoming is similarly situated to Montana. The Wyoming Supreme Court explained many of the unique characteristics of public defender offices in its state this way:

> Public defenders who are subject to a common supervisory structure within an organization ordinarily should be treated as independent for purposes of [imputing conflicts of interest]. The lawyers provide legal services, not to the public defender office, but to individual defendants. Ordinarily, the office would have no reason to give one defendant more vigorous representation than other defendants whose interests are in conflict. Thus, while individual defendants should be represented by separate members of the defender's office, the representation of each defendant should not be imputed to other lawyers in an office where effective measures prevent communications of confidential client information between lawyers employed on behalf of individual defendants.
> Similarly, there is no financial incentive for attorneys in a public defender's office to favor one client over another. The public defender does not receive more money if one client prevails and another does not. An assistant public defender, as a salaried government employee, simply does not have the financial interest in a case that is inherent in private practice.
> Another reason to adopt a case-by-case inquiry for conflicts of interest within the State Public Defender's Office is that to do otherwise would needlessly jeopardize the right of individual defendants to skilled and competent representation. As noted by the Illinois Supreme Court, "[i]n many instances the application of such a per se rule would require the appointment of counsel with virtually no experience in the trial of criminal matters, thus raising, with justification, the question of competency of counsel."

*Bolin v. State of Wyoming*, 137 P.3d 136, ¶ 25 (2006) (citing *Asch v. State of Wyoming*, 62 P.3d 945, 953 (2003)). In *Asch*, the Wyoming court also noted:

> [I]t goes without saying that an experienced public defender who specializes in criminal defense is a valuable asset within the criminal justice system, especially to the indigent defendant. . . . [G]iven Wyoming's many

small communities, with a limited number of lawyers, it could be difficult in many cases even to find local counsel for a defendant.

The *Asch* Court continued:

[Another] reason to avoid an automatic disqualification rule for imputed conflicts of interest among assistant public defenders is fiscal. Paying outside counsel every time there are multiple defendants in a case would, no doubt, be quite an expense for the taxpayers of the state. Where there has been no showing of an actual conflict of interest, and thus no showing of prejudice to the defendants, the minimal benefit of a *per se* rule would not justify the additional expense. While we cannot and should not "put a price on" the legal representation we provide to indigent defendants, the judicial branch of government still has an obligation to be fiscally responsible.

¶32 For the several reasons noted above, we conclude that the better approach for analyzing purported conflicts of interest within OPD is the case-by-case approach. We now analyze the specific facts of the case before us to determine if an actual conflict of interest occurred. Should we find an actual conflict, we would then have to determine whether counsel's performance was adversely affected by the conflict. *Morales*, 808 N.E. 2d at 514-15.

¶33 In determining whether an actual conflict of interests existed here, the *Christian* case provides guidance. In *Christian*, Christian and Jackson robbed a Taco Bell but were quickly apprehended. They were charged with robbery with a firearm. Jackson and Christian both gave information to the police that implicated the other. Christian was assigned an attorney from the PD office and Jackson was appointed one from the Alternate Defender's Office (ADO). Like Sheehy here, a supervisory attorney was the administrative overseer of both attorneys. Jackson argued that this joint supervision

14

created both a potential and an actual conflict of interest. *Christian*, 41 Cal. App. 4th at 991-92.

¶34 The ADO in California was created to represent indigent criminal defendants facing potential conflict situations with the PD office. Having an alternate defender office allowed the county to appoint conflict-free public defenders rather than appointing private attorneys in conflict situations. While the ADO was formally a branch of the PD office, it had a separate supervising attorney and the PD exercised no control or influence over the cases. *Christian*, 41 Cal. App. 4th at 992. No files, no office space, no confidential information, and no computer equipment or telephone systems were shared. The employees of both offices were advised to maintain confidences of individual clients and no sensitive information was shared. *Christian*, 41 Cal. App. 4th at 992-94, and 999-1001. We note that many of the safeguards present in the California public defender system (i.e., separate offices, separate computers and staff, separate phone lines) are likewise present in the OPD.

¶35 The *Christian* court also addressed the fact that one attorney acted as administrative overseer of both the PD office and the ADO. The court noted that he was a nominal administrator of the ADO and was "not involved in any way in the day-to-day operation of the ADO." *Christian*, 41 Cal. App. 4th at 999. The court ultimately held that there was "no evidence that use of these 'ethical walls' had been ineffective in avoiding conflicts of interest between the PD and the ADO." *Christian*, 41 Cal. App. 4th at 999. We likewise conclude that the organization and operation of the OPD—provided

15

all protocols are faithfully and strictly followed—does not, in itself, create an actual conflict of interest, nor is there any evidence that OPD's safeguards failed here.

¶36 Clearly, no system is fool-proof. A conflict of interest could at some point arise out of OPD's operations. However, given the current strong precautions and safeguards, including ethical walls, in place at OPD, dual representation of co-defendants by attorneys in different offices has not created an actual conflict of interest. It is imperative, however, that each OPD attorney adheres rigorously to these policies and rules. Should the precautions and safeguards be ignored or compromised in any way resulting in an actual conflict of interest adversely affecting counsel's performance, we will not hesitate to provide appropriate relief.

¶37 Having determined that no actual conflict existed, we need not examine counsel's performance to determine if such performance was adversely affected by the ostensible conflict.[1]

¶38 Finally, we note the ACLU filed an amicus curiae brief in this case on behalf of St. Dennis, arguing that OPD's dual representation created an actual conflict of interest. There are repeated references in the ACLU's brief to letters between a St. Dennis OPD attorney and a Strahan OPD attorney. These letters are used to bolster ACLU's argument that joint representation by public defenders of co-defendants creates conflicts of interest. This Court reviews cases on appeal based upon the court record. We frown upon "references in briefs to matters not in the record. Such matters will not be considered by the Court." *Murphy v. State*, 248 Mont. 82, 84, 809 P.2d 16, 17 (1991). In *State v.*

---

[1] Notably, St. Dennis has failed to identify any specific deficiency in his attorney's performance.

*Horseman*, 263 Mont. 87, 93-94, 866 P.2d 1110, 1114 (1993), we stated "statements included in an appellate brief but which are not in the record will not be considered on appeal." Just as appellants and appellees are confined to the record, so too are amici. We therefore decline to consider the ACLU's argument to the extent it relies on factual information that was not presented to the District Court.

¶39     *Did the District Court abuse its discretion when it denied St. Dennis' requests for immunity for a proposed witness?*

¶40     St. Dennis maintains that the court's denial of his numerous requests to grant immunity to Baldwin violated St. Dennis' federal and state constitutional rights to due process and to present witnesses in his own defense. He asserts this was an abuse of the District Court's discretion. The State counters that St. Dennis did not establish that Baldwin would be providing testimony that was incriminating to him or that he was unavailable to testify without a grant of immunity. The State opines that since Baldwin denied any involvement in Salcido's death or other wrongdoing but feared retaliation if he testified against St. Dennis, Baldwin wanted anonymity rather than immunity. Neither party, however, directs us to the dispositive statute upon which we resolve this issue, i.e., § 46-20-701(1), MCA.

¶41     Section 46-20-701(1), MCA, expressly states:

> Whenever the record on appeal contains any order, ruling, or proceeding of the trial court against the convicted person affecting the convicted person's substantial rights on the appeal of the cause, together with any required objection of the convicted person, the supreme court on that appeal shall consider the orders, rulings, or proceedings and the objections thereto and shall reverse or affirm the cause on the appeal according to the substantial rights of the respective parties, as shown upon the record. **A cause may not be reversed by reason of any error committed by the trial court**

17

**against the convicted person unless the record shows that the error was prejudicial.** (Emphasis added.)

¶42 As acknowledged by St. Dennis in his reply brief on appeal, the record in this case does not contain the information St. Dennis asked the court to review in determining whether to grant Baldwin immunity. Without this information, the record does not establish that the court's error, if any, was prejudicial. St. Dennis did not call Baldwin as a witness, nor did he make an offer of proof regarding Baldwin's proposed testimony. As a result, we can only speculate as to the contents of Baldwin's intended testimony and have no way of knowing whether the District Court's denial of immunity and the resulting absence of Baldwin's testimony prejudiced St. Dennis. Under such circumstances, we will not put a district court in error over speculation and lack of information. St. Dennis has failed to establish prejudicial error; therefore, pursuant to § 46-20-701(1), MCA, we will not reverse the District Court's ruling on St. Dennis' immunity motion.

¶43 *Did the District Court abuse its discretion in not granting St. Dennis' motion for a new trial?*

¶44 St. Dennis moved the District Court for a new trial after learning that S.E.W., P.W. and Baldwin had given statements to the investigating detectives on the last day of St. Dennis' trial. The State did not notify St. Dennis of the interviews or provide the interview transcripts until after he had been convicted of deliberate homicide. St. Dennis claimed, among other things, this was a violation of his constitutional due process rights and a violation of the *Brady* test. The State countered that it had no duty to disclose the interviews as both parties had rested their cases-in-chief before the interviews took place.

18

The State also maintained that the evidence was neither exculpatory nor material, nor had it willfully or inadvertently suppressed the statements.

¶45   Relying on *Brady*, the District Court denied St. Dennis' motion, holding that St. Dennis had not satisfied the part of the *Brady* test that required him to demonstrate that there was a reasonable probability that the result of his trial would have been different if the statements had been disclosed prior to closing arguments.

¶46   In 1963, the *Brady* Supreme Court established the rule that "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady*, 373 U.S. at 87. The *Brady* test, which has been evolving over four decades, requires a defendant to prove the existence of certain specific factors. In *Cone v. Bell*, 129 S. Ct. 1769, ___ U.S. ___ (2009), a recent United States Supreme Court case addressing *Brady*, the Supreme Court explained:

> Although the State is obliged to "prosecute with earnestness and vigor," it "is as much [its] duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one." Accordingly, we have held that when the State withholds from a criminal defendant evidence that is material to his guilt or punishment, it violates his right to due process of law in violation of the Fourteenth Amendment. In *United States v. Bagley*, 473 U.S. 667, 682, 105 S. Ct. 3375, 87 L. Ed. 2d 481 (1985) (opinion of Blackmun, J.), we explained that evidence is "material" within the meaning of *Brady* when there is a reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been different. In other words, favorable evidence is subject to constitutionally mandated disclosure when it "could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict."

*Cone*, 129 S. Ct. at 1782-83 (internal citations omitted).

19

¶47 In another relatively recent United States Supreme Court opinion discussing *Brady*, the Supreme Court stated "[a] *Brady* violation occurs when the government fails to disclose evidence materially favorable to the accused. This Court has held that the *Brady* duty extends to impeachment evidence as well as exculpatory evidence, and *Brady* suppression occurs when the government fails to turn over even evidence that is 'known only to police investigators and not to the prosecutor.' " *Youngblood v. W. Va.*, 547 U.S. 867, 869-70, 126 S. Ct. 2188, 2190 (2006) (internal citations omitted). Previously, in *Strickler v. Greene*, 527 U.S. 263, 281-82, 119 S. Ct. 1936, 1948 (1999), the United States Supreme Court stated, "[t]here are three components of a true *Brady* violation: The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." This Court has applied the *Brady* test numerous times since *Brady* was issued. *See e.g. State v. Seiffert*, 2010 MT 169, ¶ 14, 357 Mont. 188, 237 P.3d 669; *Kills On Top*, ¶ 23; *Hiebert v. Cascade County*, 2002 MT 233, ¶ 39, 311 Mont. 471, 56 P.3d 848.

¶48 While St. Dennis claims prejudice vis-à-vis all three interviews, he primarily focuses on the State's failure to provide timely access to S.E.W.'s statements. To determine whether her statements were exculpatory, valuable for impeachment purposes, and material, we look to the substantive content of the interview transcript. S.E.W. voluntarily contacted the Missoula Police Department at approximately 4:00 p.m. on January 8, 2009, wanting to provide information pertaining to the Salcido investigation. Prior to her contacting the police department, the department had no knowledge of her.

She told the detectives that in February 2008, Micah Baldwin, an acquaintance, told her he was with St. Dennis on the night Salcido was killed, and together they had attacked and beaten Salcido. S.E.W. stated that Baldwin told her he believed Salcido was still alive when they left him. S.E.W. claimed she came forward after reading the newspaper coverage of St. Dennis' trial from January 7 and wondering why Baldwin's name was not mentioned. She said that Baldwin mentioned a third person as "the one that ratted them out" after "crying to his mom," but she could not remember that person's name. S.E.W. claimed Baldwin "seemed to be proud of" murdering Salcido under what he said was the "Orange Street" Bridge. S.E.W. reported that Baldwin had been drinking when they spoke and before they parted he "put a little threat on" her.

¶49 At approximately 4:45 p.m. on January 8, the detectives interviewed P.W. who had voluntarily come forward with S.E.W. He told the detectives that he had temporarily been held by the police after he was picked up for driving on a suspended license and failing to pay some fines. His cell was near St. Dennis' cell. He reported that St. Dennis told him Baldwin "played a big role in the murder of [Salcido]." P.W. also repeated statements that S.E.W. made to him about her conversation with Baldwin. After these interviews, the police picked up Baldwin and conducted an interview in which Baldwin admitted to initially providing an untruthful alibi for St. Dennis and later withdrawing it. He strenuously and repeatedly denied participating in Salcido's beating or being with St. Dennis that night.

¶50 We disagree with St. Dennis' assertion that S.E.W.'s statement was exculpatory, material, and could have been used to impeach Strahan's testimony that only he and St.

21

Dennis participated in Salcido's beating. S.E.W.'s statement, taken as a whole, actually corroborates St. Dennis' participation in this violent crime. Her statement, which in any event would have been inadmissible hearsay, repeats Baldwin's assertions that St. Dennis would not stop kicking Salcido and that Baldwin had to pull St. Dennis off Salcido because he had "gotten carried away." Moreover, it is undisputed that: (1) the physical evidence unequivocally placed St. Dennis at the scene of the beating, (2) he did not deny beating Salcido, and (3) he confessed to beating Salcido while knowingly being recorded on the Detention Center telephone. Finally, any impeachment value S.E.W.'s statement may have had vis-à-vis Strahan's testimony is weak. While Strahan testified only he and St. Dennis beat Salcido, impeaching Strahan by saying Baldwin was there as well would have done nothing to weaken the evidence that was used to convict St. Dennis and determine his sentence.

¶51    To the extent St. Dennis complains that he was unable to use Baldwin's statements, we repeat that St. Dennis knew Baldwin's identity and could have called him as a witness at any time if he knew, or believed, Baldwin's testimony would benefit him. As the Eleventh Circuit Court of Appeals noted in *U.S. v. Valera*, 845 F.2d 923, 927-28 (11th Cir. 1988), "[t]here is no *Brady* violation when the accused or his counsel knows before trial about the allegedly exculpatory information and makes no effort to obtain its production."

¶52    As determined by the District Court, St. Dennis failed to demonstrate that had these interview transcripts been presented earlier, there was a reasonable probability that the jury verdict would have been different. This being so, these statements were not

material within the meaning of *Brady*. We therefore conclude the District Court did not abuse its discretion in denying St. Dennis' motion for a new trial.

**CONCLUSION**

¶53    For the foregoing reasons, St. Dennis' conviction is affirmed.


                                                            /S/ PATRICIA COTTER


We concur:

/S/ MIKE McGRATH
/S/ MICHAEL E WHEAT
/S/ W. WILLIAM LEAPHART
/S/ JIM RICE
/S/ BRIAN MORRIS



Justice James C. Nelson, dissenting.

¶54    I dissent from Issue 1 because I disagree with the Court that the conflicts in this case were alleviated by assigning defense counsel from separate public defender regions to represent the two defendants. In my view, distinguishing the various regions as different "firms" is an artificial distinction that is not supported by actual practice within the public defender system. Furthermore, the Opinion does not resolve the underlying issue in this case because it does not address the inherent problems brought up by the ACLU in its amicus brief.

¶55    The Montana Legislature created the statewide public defender system in 2005 "to provide effective assistance of counsel to indigent criminal defendants" and to "ensure

23

that the system is free from undue political interference and *conflicts of interest . . . .*" Section 47-1-102, MCA (emphasis added). The Commission established to oversee this new system adopted the following administrative policy to handle conflicts of interest within the system:

> When a case is determined to be a conflict of interest, the Regional Deputy Public Defender shall assign the case to a contract attorney whose name is maintained on the conflict attorney list or to a public defender employed outside his/her region.

Office of the State Public Defender Administrative Policies, No. 116, "Conflict Cases" (May 11, 2007).

¶56 The Commission also adopted standards for the handling of conflict cases. One such standard states:

> Each independent regional office, including any local office under its supervision, is a separate "firm" for purposes of representing clients. Accordingly, a client with a conflict of interest with one regional office may be represented by another regional office.

Commission Standard III(4)(B). However, simply designating regional public defender offices as separate "firms" does not make it so.

¶57 While both the Sixth Amendment to the United States Constitution and Article II, Section 24 of the Montana Constitution guarantee an individual the right to the effective assistance of counsel in all criminal prosecutions, the Sixth Amendment also imposes upon counsel certain basic duties such as "a duty of loyalty, a duty to avoid conflicts of interest." *Strickland v. Washington*, 466 U.S. 668, 688, 104 S. Ct. 2052, 2065 (1984) (citing *Cuyler v. Sullivan*, 446 U.S. 335, 346, 100 S. Ct. 1708, 1717 (1980)).

24

¶58 In *Strickland,* the Supreme Court noted that while, ordinarily, prejudice to the defendant must be shown with respect to deficient performance by counsel, there are certain instances where prejudice is presumed, such as "when counsel is burdened by an actual conflict of interest." *Strickland*, 466 U.S. at 692, 104 S. Ct. at 2067. According to *Strickland*, prejudice is presumed in such cases because "it is difficult to measure the precise effect on the defense of representation corrupted by conflicting interests." *Strickland*, 466 U.S. at 692, 104 S. Ct. at 2067.

¶59 The Supreme Court also recognized that certain conflicts of interest are so basic that they cannot be accurately assessed after a trial. *Holloway v. Arkansas*, 435 U.S. 475, 98 S. Ct. 1173 (1978) (involving joint representation of co-defendants). Consequently, the Supreme Court determined that in such cases prejudice is presumed:

> But in a case of joint representation of conflicting interests the evil—it bears repeating—is in what the advocate finds himself compelled to *refrain* from doing, not only at trial but also as to possible pretrial plea negotiations and in the sentencing process. It may be possible in some cases to identify from the record the prejudice resulting from an attorney's failure to undertake certain trial tasks, but even with a record of the sentencing hearing available it would be difficult to judge intelligently the impact of a conflict on the attorney's representation of a client. And to assess the impact of a conflict of interests on the attorney's options, tactics, and decisions in plea negotiations would be virtually impossible.

*Holloway*, 435 U.S. at 490-91, 98 S. Ct. at 1182.

¶60 In the same way, the Montana Rules of Professional Conduct (M.R.P.C.) provide that a lawyer may not represent a client if the representation would involve a concurrent conflict of interest. M.R.P.C. 1.7(a). A concurrent conflict of interest exists if:

> (1) the representation of one client will be directly adverse to another client; or

> (2) there is a significant risk that the representation of one or more clients will be materially limited by the lawyer's responsibilities to another client . . . .

M.R.P.C. 1.7(a). These Rules also provide that lawyers associated in a "firm" cannot "knowingly represent a client when any one of them practicing alone would be prohibited from doing so . . . ." M.R.P.C. 1.10(a).

¶61 While this Court's Opinion points out that the OPD "is conceptually designed so that each regional office is an 'independent law firm,' " Opinion, ¶ 21, it fails to recognize that, in actual practice, there is very little "independence" between the regional offices. In point of fact, the idea that regional public defender offices are separate and independent law firms is a myth.

¶62 For instance, when he recognized that there was a conflict in this case, Regional Deputy Public Defender Ed Sheehy assigned two attorneys, Paulette Ferguson and Christopher Daly, from his region (Region 2 out of Missoula) to represent St. Dennis. Then, rather than turning Strahan's representation over to the Regional Deputy Public Defender in Region 1 to appoint someone from that region, Sheehy himself appointed Carolyn Gill and Britt Cotter from the Region 1 office in Kalispell as counsel for Strahan. This is not consistent with the idea that these are "separate firms." Rather, this indicates that Sheehy's authority and supervisory capacity extended over all four attorneys. Indeed, the deputy public defenders are "solely responsible for providing guidance to and determining litigation strategy for attorneys assigned to their supervision." Commission Standard III(4)(A). Hence, here, Sheehy violated the Commission's own standard.

¶63 As further evidence of that authority and supervisory capacity, there is an exchange of letters between Sheehy and Gill regarding Strahan's representation. While the Court concludes that we should refrain from considering these letters because they are not part of the record on appeal, Opinion, ¶ 38, in light of the fundamental right to counsel and the importance of this issue regarding the OPD, I would remand this case to the District Court to allow it to review these letters. Because they were written almost six months after the hearing in which Sheehy and Chief Public Defender Randy Hood assured the court that any conflicts in the representation of St. Dennis and Strahan had been resolved, the District Court never had a chance to consider these letters. But, in my view, the court should have the opportunity to review these letters because they demonstrate that the conflicts in the representation of St. Dennis and Strahan had not been resolved.

¶64 Moreover, the Court mischaracterizes these as "letters between a St. Dennis OPD attorney and a Strahan OPD attorney." Opinion, ¶ 38. They are, however, much more than that. They are actually letters between Sheehy, the Regional Deputy Public Defender for Region 2, who appointed the attorneys for both defendants, and a Strahan OPD attorney from Region 1. These letters exemplify Sheehy's authority over and supervision of the counsel he appointed from both regional offices. In the first letter, dated September 12, 2008, Sheehy chastises Gill for the position she was taking in Strahan's case regarding the examination of some of the physical evidence by an OPD approved expert in Florida. Sheehy states in his letter:

27

[W]hile you are representing a different client, I need to tell you that I don't believe it would look good for you, as an OPD attorney, even from a different Region, raising an objection to chain of custody, when the expert the evidence is sent to is an OPD expert. Please explain to me what your concerns are on chain of custody so we can try to work out an acceptable arrangement, on this matter, without your attacking other OPD attorneys or an OPD expert.

In the second letter, Gill reminds Sheehy that they are supposed to be acting as separate offices with respect to these two cases and, as such, she will not hesitate to act in her client's best interests.

¶65 These letters belie Sheehy's earlier representation to the District Court that the regional public defender offices are separate "firms." His letter indicates that Sheehy considers the OPD to be a single entity whose procedures should not be questioned or challenged. And, this letter clearly shows the inherent problem with having the attorneys for both defendants come from within the public defender system.

¶66 Also not of record in this matter, but of critical importance to the conflict issue in this case—and thus information that also should be reviewed by the District Court on remand—is a report prepared by a group of consultants from American University retained by the Commission to assess Montana's new public defender system. These consultants did not issue their final report until October 2009 (hereafter referred to as "the AU Report")[1]. The AU Report was based upon a review of the public defender system in Montana from August 2008 through June 2009. It stated the following with respect to conflict cases:

---

[1] A copy of the AU Report may be obtained from the Public Defender Commission website at http://publicdefender.mt.gov/AUeval.asp (accessed October 27, 2010).

> *As to the conflict issue at the trial level, it is strongly suggested that the contract lawyer retained in a conflict situation or staff lawyer from another Region does not resolve the conflict, either in form or substance.* In practice, whether intended or not, the Agency is highly centralized. The Chief Defender exercises complete authority throughout the Agency subject only to the Commission, and she is not reluctant to exercise that authority. *Regions are not independent entities;* the enabling legislation confers authority upon and responsibility for everything and anything that relates to representation of the indigent to the Chief Public Defender.

The AU Report, p. 36 (emphasis added).

¶67 In addition, the AU Report stated that, in the consultant's view, Montana's public defender system was a single law firm, regardless of the creation of regions and regional directors: "While the Legislation authorizes the Commission to create up to 11 Regions, neither the Regions nor the Appellate office are independent units in fact or in practice." The AU Report, p. 38 n. 15. Rather, as the ACLU points out in its amicus brief on appeal,

> the public defender system in Montana is one cohesive whole, supervised closely by one person, governed by the same policies and procedures, trained in the same way by the same personnel, and tied to the same contracts for investigators and experts. *For all intents and purposes it is one administrative unit; one single entity with various branches.* The different regions within the public defender system are not separate or distinct in any way from the overall public defender system. Each is accountable to the same person, under the same standards and principles. [Emphasis added.]

¶68 Furthermore, in attempting to distinguish the regional public defender offices from private law firms in the context of conflict cases, the Court points out that unlike private law firms, the OPD is a not-for-profit public entity and that because its attorneys are salaried employees, their compensation is not driven by their success or failure. Opinion, ¶ 30. Similarly, the State claims in its brief on appeal that unlike lawyers in a law firm,

public defenders do not have a financial incentive to represent clients with conflicts of interest because they do not share legal fees.

¶69 Although it is true that public defenders are salaried employees and thus they do not have a financial incentive to represent conflicted co-defendants, the OPD itself has a fiscal interest in retaining the representation of conflicted co-defendants, not because it would result in the OPD making more money—as would be the case with a private law firm—but because it would prevent the loss of fiscal resources. As St. Dennis points out in his brief on appeal, the OPD is "a woefully underfunded agency." Consequently, the more conflicted co-defendants who are assigned to counsel outside the OPD, the higher the cost to the OPD.

¶70 The Court also notes its satisfaction with the "safeguards" and "ethical walls" in place at OPD that purportedly guarantee that each regional public defender office remains a separate "firm" under the M.R.P.C. for conflict of interest purposes. Opinion, ¶¶ 34, 36. Included among these safeguards, the Court lists various OPD privacy and confidentiality protections such as the method the OPD employs to keep client bills separate and the fact that attorneys from different regions do not have physical access to OPD offices in other regions, nor do they have computer access to other OPD attorney's files. Opinion, ¶¶ 23, 34.

¶71 However, there is more to the issue of conflict of interest than simply confidentiality in communications. Even if information remains confidential and access to an office building is limited, a concurrent conflict remains simply because the defendants' interests are directly adverse.

30

¶72 In this case both St. Dennis and Strahan were charged with being accountable for the actions of the other, and, from the beginning, Strahan placed the lion's share of the culpability onto St. Dennis. Strahan's testimony was critical and damning. It was Strahan's interview with law enforcement officers that initially implicated St. Dennis in Salcido's death. It was Strahan who characterized St. Dennis as the initial and primary aggressor in the death. It was Strahan who told about St. Dennis cleaning blood off of his shoes. It was Strahan who provided the only eye-witness testimony against St. Dennis at trial. That these two co-defendants had differing defenses and divergent interests is an understatement.

¶73 In *Adams v. State*, 380 So. 2d 421 (Fla. 1980), the Supreme Court of Florida held that a trial court's appointment of a public defender from one circuit to handle a postconviction motion asserting ineffective assistance of counsel against a trial attorney from another circuit was improper. The court reasoned that the second public defender would be faced with the dilemma of vigorously asserting the petitioner's claim or defending the professional reputation of his office. This, the court asserted, "would be at least as great a conflict as having the same office represent two defendants with conflicting interests." *Adams*, 380 So. 2d at 422.

¶74 A similar dilemma is present in this case as evidenced by Sheehy's letter to Gill wherein Sheehy chastises Gill for raising an objection to the chain of custody because he doesn't believe "it would look good" for Gill, as an OPD attorney, to raise such an objection when the expert the evidence is sent to is an OPD expert. In addition, neither Strahan's nor St. Dennis's attorneys could raise the conflicts issue because of the

31

argument established by their supervisors, Sheehy and Hood. To do so would have been to argue against the position of their supervisors and employer.

¶75 In conclusion, the public defender system exists to protect the fundamental right of effective assistance of counsel. Despite the best efforts of the Legislature, the Commission, and many who have worked to create the public defender system, the current system is burdened with some significant flaws—as evidenced here and in the AU report. Moreover, it is seriously underfunded. Rather than sweeping these problems under the technicality carpet, we should address these issues head on to the end that the 2011 session of the Legislature will have some guidance in addressing the public defender system's problems. In failing to do so, we are ultimately passing the buck to further litigation and, likely, the federal courts. I cannot agree with this approach.

¶76 I would remand this case to allow the District Court to reconsider the conflict-of-interest issue in light of the information previously discussed. I dissent from our failure to do so.

/S/ JAMES C. NELSON